**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KENNETH A CIULLO AND JOANNA CIULLO as JTWROS, | **EFC CASE** |
| Plaintiffs, | **CASE NO.:  10-CV-1673 (UA)(DC)** |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| BANK OF AMERICA CORPORATION, MERRILL LYNCH & CO, INC., KENNETH D. LEWIS, JOHN A. THAIN, JOE L. PRICE and NEIL A. COTTY | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs, Kenneth A. Ciullo and Joanna Ciullo as joint tenants with right of survivorship, on behalf of themselves and all others similarly situated, by their undersigned counsel, make the following allegations on information and belief based upon the investigation of counsel, except as to the allegations pertaining specifically to Plaintiffs, which are based on personal knowledge. The investigation conducted by Plaintiffs' counsel included, *inter alia*, a review and analysis of (i) publicly available news articles and reports; (ii) public filings, including, but not limited to, filings by Merrill Lynch & Co., Inc. ("Merrill Lynch" or "Merrill") and Bank of America Corporation ("BAC") with the United States Securities and Exchange Commission ("SEC"); and (iii) press releases issued by Defendants (defined below), news reports and other publicly-available information.

## I.   NATURE OF THE ACTION

1.      This is a securities class action filed on behalf of all persons and entities that purchased or otherwise acquired BAC call options and/or sold BAC put options between September 15, 2008 and January 22, 2009, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

2.      This action arises out of the dissemination of materially false and misleading statements and omissions by Defendants concerning the financial conditions of BAC and Merrill and regarding BAC's acquisition of Merrill Lynch in violation of §§ 10(b) and 20(a) of the of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 10b-5 promulgated thereunder.  As a result of Defendants' false and misleading statements, BAC's options traded at artificially inflated prices during the Class Period.

3.      On July 21, 2008 BAC announced better than expected results for the second quarter of 2008.  During the conference call for the quarter (the "July 21 Conference Call"), Defendant Joe L. Price ("Price"), BAC's CFO assured investors that "we think the worst is behind us on value declines, as evidenced in our results for the quarter."

4.      In mid-September 2008, as Lehman Brothers Holdings, Inc. ("Lehman") faced collapse and Merrill confronted increasing liquidity problems, Defendant John A. Thain ("Thain"), Merrill's CEO, called Defendant Kenneth A. Lewis ("Lewis"), BAC's CFO, on the morning of Saturday, September 13, 2008 to discuss a possible deal between the two banks.  The urgency of the call came after a meeting between Henry M. Paulson, then-Secretary of the United States Treasury ("Paulson") and the heads of many major investment banks during which they discussed possible buyers for Lehman and the likelihood that Merrill would be the next bank to fail.

2

5.      Over the next thirty-six hours, discussions ensued, due diligence began and ended, and by the end of the weekend a deal had been struck. Under the terms of the deal set forth in the merger agreement (the "Merger Agreement"), Merrill shareholders would receive .8595 shares of BAC common stock in exchange for each Merrill Lynch common share (the "Merger"). At the time, this amounted to 1.8 times the stated book value of Merrill stock. The Merger was announced on September 15, 2008, voted on and approved by shareholders on December 5, 2008 and closed on January 1, 2009.

6.      During the brief merger negotiations, BAC and Merrill negotiated discretionary 2008 year-end bonuses for Merrill executives and employees. Ultimately, BAC agreed to permit Merrill to pay up to $5.8 billion in bonuses. Moreover, BAC, Thain and Lewis also agreed to allow Merrill to accelerate payment of these bonuses to December 2008, prior to the close of the Merger, rather than in January, as was customary for Merrill.

7.      Throughout October 2008, Defendants made numerous disclosures regarding the financial conditions of both BAC and Merrill and BAC conducted a secondary stock offering. In spite of the fact that Merrill was suffering through the worst month in its history, with October net losses of $4.5 billion and continuing to mount, BAC investors continued to be kept in the dark and Or misled by Defendants regarding: (a) BAC's grossly inadequate due diligence of Merrill; (b) the amount of toxic assets on Merrill's balance sheet; (c) the fact that Merrill and BAC had agreed to permit up to $5.2 billion in Merrill bonuses to be paid prior to the close of Merger; (d) the billions of dollars of losses suffered by both Merrill and BAC; and (e) that federal regulators had exerted pressure on the companies to quickly negotiate a deal.

8.      On October 6, 2008, BAC issued a press release announcing third-quarter 2008 earnings (the "October 6th Press Release") announcing that it had suffered a substantial decline in

earnings as compared to the previous year and planned to raise additional capital. However, BAC continued to boast about the Merger despite the undisclosed fact that Merrill suffered possibly the worst single month in its history with net losses of $4.5 billion and was projecting additional losses for the coming months.

9.      On October 9, 2008, a Secondary Offering was conducted pursuant to BAC's Shelf Registration Statement dated May 5, 2006 and filed with the SEC (the "Secondary Offering Registration Statement"), and a Prospectus Supplement filed with the SEC (the "Prospectus Supplement") (collectively, the "Secondary Offering Documents") to help finance the Merger.

10.     In these October disclosures, Lewis continued to underscore BAC's "strength and stability" and further averred that the Merger "should significantly enhance [BAC's] earnings."

11.     Throughout October and November 2008, Merrill and BAC both suffered material publicly undisclosed losses that significantly jeopardized Merrill and BAC. Indeed, by the end of the day on December 5, 2008, the date of the shareholder vote on the Merger, Merrill had lost at least $10 billion and was projecting additional billions of dollars in losses for December. These losses had become so large that when BAC learned of them, prior to the closing of the Merger, it contemplated invoking the material adverse change ("MAC") clause in the Merger Agreement.

12.     Despite these material facts, neither Merrill nor BAC disclosed information to the investing public regarding Merrill's losses or that BAC had agreed to pay out Merrill executive bonuses on an accelerated schedule. Rather, on October 31, 2008, BAC mailed the Joint Proxy Statement (defined below) to stockholders of record as of October 10, 2008 recommending that they approve the Merger even though the Joint Proxy Statement failed to disclose material

information concerning the financial conditions of Merrill and BAC and the agreed to accelerated payment schedule of Merrill's outsized bonuses. Additionally, the Joint Proxy Statement specifically highlighted the purported "strong capital position" of the combined company, and falsely represented that there had been no "material adverse changes" to Merrill's financial condition. Further, the Joint Proxy Statement represented that Merrill had agreed not to pay year-end bonuses prior to the closing of the Merger without BAC's consent, when in fact, BAC had already secretly granted its consent with respect to the payment of up to $5.8 billion in bonuses.

13.     Without updating the Joint Proxy Statement to include information regarding Merrill's and BAC's true financial condition and the accelerated bonus schedule, BAC shareholders voted and approved the Merger on December 5, 2008. Accordingly, the Merger was set to close on January 1, 2009, pursuant to the terms outlined in the Joint Proxy Statement on September 15, 2008.

14.     Following the shareholder vote, Defendants continued to conceal highly material information from investors. Several days after the vote, Lewis feared that BAC could not absorb Merrill's staggering losses without suffering financial ruin. Accordingly, on December 17, 2008, Lewis called Paulson to inform him that he planned to invoke the MAC clause and exit the Merger. Paulson requested an immediate meeting.

15.     Later that evening Lewis met with Paulson, United States Federal Reserve Chairman Ben S. Bernanke ("Bernanke") and other officials to discuss BAC's possible termination of the Merger. As Paulson later testified before Congress, he told Lewis that if he invoked the MAC clause, Lewis and BAC's senior management and Board of Directors would be terminated. Following this threat, Lewis agreed to not invoke the MAC clause and to

complete the Merger.  However, to prevent BAC's collapse in light of Merrill's huge losses, Lewis asked the Government for, and obtained, a commitment that BAC would receive a $20 billion capital infusion and an asset guarantee of $118 billion.  BAC, and Lewis specifically, hid this information from shareholders.

16.     The Merger closed on January 1, 2009 without BAC shareholders' knowledge of the following: (1) Merrill's losses in excess of $15 billion in the fourth quarter of 2008; (2) BAC's $1.8 billion loss in the fourth quarter of 2008; (3) BAC's contemplation of, and subsequent refrain from, invoking the MAC clause; (4) BAC's inadequate capital levels and massive exposures from Merrill's portfolio and thus BAC's need for government assistance to close the Merger so that it could absorb Merrill's huge losses; and (5) despite Merrill's losses, it paid its executives $3.6 billion in bonuses prior to the close of the Merger.

17.     A press release was issued that day announcing the completion of the Merger (the "January 1st Press Release"), but similarly failed to disclose any of the material information discussed above.

18.     News of the foregoing materially adverse facts did not begin to surface until mid-January 2008.  On the morning of January 12, 2009, a Citigroup analyst wrote that BAC might post a fourth quarter loss and cut its dividend from $0.32 to $0.05.  On January 15, 2009, *The Wall Street Journal* reported that BAC was to receive billions of dollars from the U.S. government "because of Merrill's larger-than-expected losses in the fourth quarter."

19.     Subsequently, BAC moved its earnings conference call from January 20 to January 16, 2009.  During that call, BAC revealed that Merrill in fact suffered losses of more than $15 billion during the fourth quarter of 2008 and that BAC itself suffered a $1.8 billion loss – its first quarterly loss in 17 years.  BAC also announced that the U.S. Government agreed to

provide it with an additional $20 billion to cover those losses and agreed to provide protection against further losses on $118 billion in selected capital markets exposure, primarily from the former Merrill Lynch portfolio.

20.     On January 20, 2009, based on the previously undisclosed information, analysts concluded that BAC needed more than $80 billion to restore adequate capital levels.

21.     In response to these disclosures BAC shares lost more than half their value, falling from $12.99 on January 9 (the trading day immediately prior to the January 12 disclosure) to $5.10 on January 20.   However, the price of BAC common stock and options were still inflated as BAC continued to conceal the fact that it had permitted Merrill to pay out bonuses prior to the close of the Merger.

22.     On January 21, 2009, the *Financial Times* reported that immediately prior to the closing date, Merrill had paid $3-4 billion in bonuses notwithstanding Merrill's huge fourth quarter losses.  In response to this disclosure, BAC stock fell another 15% percent on January 22.

23.     Events surrounding the Merger have continued to have a negative effect on BAC. In late January 2009, the New York Attorney General, Andrew M. Cuomo ("NY AG"), initiated an investigation into Merrill's accelerated bonus payments.

24.     On September 8, 2009 the NY AG's office released a letter which stated that it found "at least four instances in the fourth quarter of 2008 where [BAC] and its senior officers failed to disclose material non-public information to its shareholders."   Such material information included, Merrill's losses prior to the approval of the Merger, goodwill write-downs, the decision to invoke the MAC clause and accelerated bonus payments.

25.     In May 2009, Congress initiated an investigation into the circumstances surrounding the Merger, including BAC's refusal to disclose Merrill's losses, and has held hearings in which Lewis, Bernanke and Paulson have testified.

26.     In August 2009, the SEC brought an action against BAC for violations of § 14(a) and Rule 14a-9 of the Exchange Act alleging that BAC's failure to disclose the accelerated payment of bonuses violated the federal securities laws because the omission made the statements in the Joint Proxy Statement were materially false and misleading.

27.     On September 18, 2009 it was reported that the Federal Bureau of Investigation and the U.S. Department of Justice had been conducting an extensive criminal investigation of BAC in connection with the Merger.

28.     On February 4, 2010, the NY AG filed a civil complaint against BAC, Lewis and Price for violations of New York's securities laws.

## II.     **JURISDICTION AND VENUE**

29.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

30.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

31.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein occurred in substantial part in this District.  In addition, Merrill Lynch maintains its corporate headquarters in this District and BAC has offices and does business in this District.

32.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including

the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## III.   **PARTIES**

33.    Plaintiffs Kenneth A. Ciullo and Joanna Ciullo as JTWROS purchased or otherwise acquired BAC call options and/or sold BAC put options as set forth on the attached Certification, and were damaged thereby.

34.    Defendant BAC is a Delaware financial holding company.  Its principal place of business is located in Charlotte, North Carolina.  BAC is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a range of banking, investing, asset management and other financial and risk-management products and services. BAC serves clients in 175 countries.

35.    Merrill is a Delaware holding corporation.  Its principal place of business is located in New York, New York.  Through its subsidiaries, Merrill Lynch is the largest securities broker in the United States. Merrill Lynch asserts that it is one of the world's leading wealth management, capital markets and advisory companies.  It has offices in 40 countries and territories and total client assets of approximately $1.6 trillion.  As an investment bank, it claims to be a leading global trader and underwriter of securities and derivatives across a broad range of asset classes and serves as a strategic advisor to corporations, governments, institutions and individuals worldwide.

36.    Defendant Kenneth D. Lewis was the Chairman of the Board and CEO of BAC during the Class Period.  By virtue of Lewis' senior position with BAC, he possessed the power and authority to control the contents of the Merger Agreement, the Joint Proxy Statement, BAC press releases, media and investor presentations and other SEC filings.

9

37.     Defendant Joe L. Price was BAC's CFO during the Class Period.  Because of his senior position with the Company, Price possessed the power and authority to control the contents of the Joint Proxy Statement, Secondary Offering Registration Statement, BAC press releases, media and presentations, and other SEC filings.

38.     Defendant Neil A. Cotty, during the Class Period, was BAC's Chief Accounting Officer ("CAO") and following the announcement of the Merger, was Merrill's acting CFO, and acted as a direct liaison between BAC, including Lewis and Price, and Merrill.

39.     Defendant John A. Thain was the Chairman of the Board and CEO of Merrill Lynch prior to the Merger's closing.  After the Merger closed, Thain became the President of Global Banking, Securities and Wealth Management at BAC until he was relieved of his duties on January 22, 2009.  Because of his senior position with Merrill, Thain possessed the power and authority to control the contents of the Merger Agreement, Joint Proxy Statement and Merrill's press releases, media and investor presentations, and other SEC filings.

40.     The term "Individual Defendants" refers collectively to Lewis, Thain, Price, and Cotty.

41.     The term "Defendants" refers collectively to BAC, Merrill, Lewis, Price, Cotty and Thain.

42.     Each of the Defendants participated in the drafting, preparation, or approval of the various materially false and misleading statements described herein and were responsible for the truth and accuracy of those statements.

IV.     **SUBSTANTIVE ALLEGATIONS**

A.     **The Multi-Billion Dollar Merger Is Negotiated In Thirty-Six Hours**

43.     On Friday, September 12, 2008, in light of the rapidly declining status of the

economy it became clear that Lehman would have to find a buyer or face bankruptcy by September 15, 2008. Lehman's impending demise was certain to further destabilize financial markets by limiting funding to other financial companies with large exposure to mortgage-backed securities similar to Lehman's leaving such companies vulnerable to collapse.

44.    Thain recognized the need for Merrill to find a buyer so that it would not be in the same position as Lehman. Accordingly, on September 13, 2009, Thain contacted Lewis to discuss a possible deal between BAC and Merrill. Because of the need to move expeditiously in light of the apparent imminent bankruptcy of Lehman and deteriorating market conditions, Thain and Lewis agreed to meet in New York that day.

45.    By 2:30 p.m. that afternoon, the two CEOs met. Thain proposed to sell to BAC a 9.9 percent stake in Merrill. Lewis declined the offer and countered that he was only interested in buying 100 percent of Merrill. Recognizing that Merrill's survival was at risk, Thain ultimately agreed to sell Merrill to BAC for $29 per share, or a 70 percent premium over Merrill's closing price on Friday September 12, 2008.

46.    As federal regulators began to learn of these discussions, they exerted pressure on the parties to finalize the transaction before the markets opened on Monday, September 15. As such, early on September 14, 2008, Defendants Thain and Lewis met to discuss the results of their respective due diligence investigations. At the conclusion of the meeting they agreed to have representatives from Merrill and BAC and the banks' respective legal advisors negotiate the terms of a transaction to combine the two companies. During these discussions, representatives of Merrill indicated that Merrill would seek a significant premium to its closing price on September 12, 2008 of $17.05 per common share, as well as an appropriate multiple of book value. The parties' agreed to present to their respective boards a proposed transaction with a

price of $29.00 for each share of Merrill Lynch common stock, which equated to an exchange ratio of 0.8595 based on the closing price for shares of BAC common stock on September 12, 2008.

47.     On the afternoon of Sunday, September 14, 2008, BAC and Merrill Lynch senior management met with their respective company's financial advisors; BAC with J.C. Flowers & Co. LLC ("J.C. Flowers"), Fox-Pitt Kelton Cochran Caronia Waller and Bank of America Securities, and Merrill with Merrill Lynch, Pierce, Fenner & Smith, Inc.  The advisors presented to their respective boards the results of their due diligence investigations for which the financial advisors were paid an aggregate amount of $20 million.  Each financial advisor opined that the merger was "fair", from a financial point of view, to each side.  Accordingly, each Board of Directors voted unanimously to approve the Merger Agreement.

**B.     BAC and Merrill Secretly Agree to Accelerate the Payment of Bonuses to Merrill Executives and Employees**

48.     BAC and Merrill officers spent a large portion of their brief merger negotiations discussing Merrill's executives' and employees' bonus.  According to Thain's deposition testimony in connection with the NY AG's investigation, the accelerated payment of the bonuses was incorporated into the Merger Agreement.  The provision provided that bonuses could be paid prior to the close of the Merger, scheduled for January 1, 2009, and before the public announcement of Merrill's fourth quarter financial results.  This accelerated schedule deviated from Merrill's usual compensation practices which paid bonuses in January.  According to Merrill's 2008 Definitive Proxy, filed with the SEC on March 14, 2008 (the "March 2008 Proxy") and later incorporated by reference into the Joint Proxy Statement, annual bonuses are "paid in January for performance in the prior fiscal year."

12

49.     Pursuant to the Merger Agreement, BAC agreed to permit Merrill to pay, pursuant to Merrill's Variable Incentive Compensation Program ("VICP"), up to $5.8 billion in discretionary bonuses to its executives and employees prior to the close of the merger.

50.     The acceleration of the payout of Merrill bonuses was material to BAC shareholders for several reasons.  First, payment of bonuses in December meant that Merrill executives would receive bonuses despite Merrill's poor performance.  Second, the accelerated scheduled meant that BAC would be unable to reduce or eliminate Merrill's bonus once BAC assumed control over Merrill.  Third, paying out the bonuses prior to the close of the Merger meant that BAC shareholders would receive an asset worth billions of dollars less than originally valued.

C.     **The September 15, 2008 Press Release, Conference Call and Press Conference Announcing the Merger Fail to Disclose Material Information**

51.     On September 15, 2008, after thirty-six hours of negotiations and purported due diligence, Merrill and BAC issued a joint press release (the "September 15th Press Release") announcing that BAC had agreed to acquire Merrill Lynch in a $50 billion all stock transaction. The Merger was valued at $50 billion based on BAC's closing price on September 12, 2008 of $33.74.  Under the terms of the Merger, Merrill shareholders would receive .8595 shares of BAC common stock in exchange for each Merrill common share; 1.8 times the stated book value of Merrill stock at the time.  According to the press release, BAC expected the Merger to close in the first quarter of 2009.  The Merger ultimately closed on January 1, 2009.

52.     After the announcement of the Merger, BAC and Merrill stock traded in tandem, and therefore the price of BAC common stock and options were affected by news and disclosures concerning both companies.

53.     The September 15th Press Release, which was filed with the SEC as an exhibit to

a Form 8-K, stated that the Merger would provide advantages to BAC, including that "Bank of America expects to achieve $7 billion in pre-tax expense savings, fully realized by 2012[,]" and that "[t]he acquisition is expected to be accretive to earnings by 2010."

54.   Defendants BAC, Thain, and Lewis praised the Merger in the press release stating:

> Bank of America Corporation today announced it has agreed to acquire Merrill Lynch & Co., Inc. in a $50 billion all-stock transaction that creates **a company unrivalled in its breadth of financial services and global reach**.

> "Acquiring one of the premier wealth management, capital markets, and advisory companies is a **great opportunity for our shareholders**," Bank of America Chairman and Chief Executive Officer Ken Lewis said. "**Together, our companies are more valuable** because of the synergies in our businesses."

> "Merrill Lynch is a great global franchise and I look forward to working with Ken Lewis and our senior management to create what will be the leading financial institution in the world with the combination of these two firms," said John Thain….

> * * *

> Adding Merrill Lynch both enhances current strengths at Bank of America and creates new ones, particularly outside of the United States.

55.   BAC further emphasized the vast contributions Merrill would provide to BAC, and also acknowledged that the continued success of BAC is largely dependent on the reputation of Merrill's financial advisors and Merrill's assets, including its substantial interest in BlackRock:

> The combined company would have leadership positions in retail brokerage and wealth management. By adding Merrill Lynch's more than 16,000 financial advisers, Bank of America would have the largest brokerage in the world with more than 20,000 advisers and $2.5 trillion in client assets.

> The combination brings global scale in investment management, including an approximately 50 percent ownership in BlackRock, which has $1.4 trillion in assets under management. Bank of America has $589 billion in assets under management.

14

Adding Merrill Lynch both enhances current strengths at Bank of America and creates new ones, particularly outside of the United States. Merrill Lynch adds strengths in global debt underwriting, global equities and global merger and acquisition advice.

After the acquisition, Bank of America would be the number one underwriter of global high yield debt, the third largest underwriter of global equity and the ninth largest adviser on global mergers and acquisitions based on pro forma first half of 2008 results.

56.     The statements made in the September 15th Press Release were materially false and misleading because BAC's due diligence of Merrill was grossly inadequate and the amount of toxic assets on Merrill's balance sheet were so substantial that BAC would not have been able to absorb them had the Government subsequently agreed to a $138 billion bailout. Moreover, BAC failed to disclose that BAC and Merrill agreed to the accelerated payout of Merrill's bonuses.

57.     The above statements were material to investors. In light of Merrill's losses, the 70% premium BAC agreed to pay, and the turmoil in the housing market, investors were concerned about whether BAC adequately investigated Merrill's financial strength. Investors would also be concerned about whether Merrill executives had attempted to enrich themselves at the expense of BAC shareholders by draining Merrill of value before the Merger closed.

58.     In response to the statements made on September 15, 2008, Richard Bove, an analyst with Ladenburg Thalmann & Co., Inc., reported that same day that "[t]he fact that Bank of America paid a high premium for Merrill and would not buy Lehman indicates that the due diligence done on both companies suggests that Merrill may be in stronger condition than thought."

59.     During the investor conference call and press conference the same day (the "September 15th Conference Call" and the "September 15th Press Conference"), investors

questioned the hurriedness into which the Merger was entered and the price of the transaction. Lewis and Price assured the investing public that BAC had performed adequate due diligence, that the premium for Merrill was justified as it had recently taken actions to greatly reduce its risk and the amount of toxic assets on its balance sheet, and that BAC understood the risks and the quality of the assets it would incur by acquiring Merrill Lynch.

60.     Defendants falsely represented that they were under no pressure from regulators to complete the deal quickly. For example, in response to an analyst question during the September 15th Press Conference about whether regulators had pressured the parties to get the deal done quickly, Lewis stated:

> First of all, **there was no pressure from regulators**. I'm sure, after the fact, that having this not be an issue is obviously very positive to them, but **absolutely no pressure**.

61.     This statement was false because, during the merger negotiations, Secretary Paulson had issued an ultimatum that BAC and Merrill finalize the transaction by Monday morning, September 15, 2008. As reported by *PBS Frontline*, Paulson was adamant the deal had to be completed by Monday morning. Also, Thain has subsequently admitted that Paulson demanded that the parties finalize the transaction by September 15.

62.     During the September 15th Conference Call Lewis attempted to reassure the investing public that BAC had conducted adequate due diligence and understood the risks associated with acquiring Merrill. Lewis also echoed Price's comments that BAC was aware of Merrill's credit and assets because it was a competitor in the marketplace. Specifically, Price stated:

> [F]rom a risk or due diligence perspective…we competed against Merrill Lynch and have known them well for years in addition to discussing business opportunities several times. **We sent in a large team to review areas such as asset valuations, trading positions and the like. We also were joined by a**

**team from J.C. Flowers that had done extensive due diligence over some time in reviewing other potential transactions [involving Merrill] so they were very familiar with Merrill Lynch's books.**

And:

As both [Lewis] and [Thain] said, this transaction moves the ball forward many yards in our wealth management and investment banking businesses on both a domestic and global front. The advantage a company like Bank of America has is that with our strength, diversity and scale, we can continue to manage through today's tough environment and still be positioned to take advantage of rare opportunities to expand our franchise for the long-term benefit of shareholders.

63.     During the September 15th Conference Call the Individual Defendants answered analysts' questions regarding the Merger and assured investors of the propriety of BAC's acquisition of Merrill:

[Question]:  . . . I think a lot of people would view Merrill's stock as selling off today and this week if the deal hadn't been announced. I guess the question is why pay $29 at this point?

[Lewis]: You can think of several scenarios. One, probably the more likely is that **Merrill had the liquidity and capacity to see this through**. It's not necessarily easy because it's just the times, but more likely than not, they would have seen-- they would have seen this through and come out on the other side. Secondly, there's always the possibility of investment in Merrill Lynch by others and so then others would have that opportunity, and then finally, we could have rolled the dice and possibly could have got it at a cheaper price. We thought, Matt, that the long-term benefits were so overwhelming, it was such a strategic opportunity that we elected not to roll the dice and to go ahead and do it at this time. Again, also, you – I don't know – I don't know anybody who's perfect at picking the absolute bottom, and we thought we had a compelling situation for the shareholders over the long term and at the time, we did.

[Question]: Okay, and maybe you can provide a little more color on some of the due diligence that was done . . . also, what kind of protection do you have if, say, six months from now the environment proves that much worse than we are right now?

[Price]: . . . clearly we had a tremendous amount of historical knowledge both as a competitor with Merrill Lynch but also have reviewed and analyzed the company over the years. As Ken referenced, we did have as advisor several, among them, J.C. Flowers with **pretty extensive knowledge of the company** and while none of us like the market turmoil we've been through in the last

17

year, it has caused us all to be much more attuned to the quality of particular named credits and/or other asset classes . . . [also,] as you would expect, we deployed the team that we would ordinarily deploy in these types of situations…collectively with that group and quite frankly, the progress that Merrill Lynch had made in reducing the risk exposure as such and analyzing them and having all that laid out, given the efforts that the management team has made over the last period made it possible for us.

[Lewis]: One reference was that in comparing it to a previous review that it was night and day, that John and his team had made incredible progress since the first time they had looked at it.

*   *   *

[Lewis]: The numbers that we presented today we have considered marks on the assets as well as planned actions that Merrill Lynch has either executed or had in the works during the quarter as they've continued to make progress in risk reduction so those have been done . . . [we] feel pretty good about the progress that Merrill Lynch had made itself. John, you may want to elaborate on that.

[Thain]: Let me just add, as you know, we have been consistently reducing the risky assets on our balance sheet, the biggest single transaction was the sale of the $30 billion notional amount of CDOs, but subsequent to the end of the second quarter and subsequent to that sale, we have continued to sell risky assets and so you will see when we report our third quarter balance sheet, you will see a further reduction in those risky assets. Most of which has already been completed.

64.     During the September 15th Press Conference, Lewis emphasized that BAC's due diligence was more than sufficient, and had established that Merrill's risk profile had been "dramatically" reduced in recent months:

[H]e and his firm [Chris Flowers and J.C. Flowers] had done **quite an amount of due diligence on Merrill Lynch fairly recently, and it was very, very extensive**. They had looked at the marks **very comprehensively**, so this allowed us to have him and [his] team as an advisor, and just update the information they already had. So that was one of the key ingredients to being able to do this as quickly as we did.

I will say that Chris's comment was it's night and day from the time we first looked at it to now. He was very complimentary of what John and his team had done in terms of **dramatically reducing the marks**, in many cases not only – not reducing the marks but getting rid of the assets, which is the best thing to do, so a much lower risk profile than he'd seen earlier on.

65.     The statements made during the September 15th Conference Call and September

15th Press Conference were materially false and misleading, because as more fully described below, BAC's due diligence was grossly deficient. Accordingly, Defendants had no reasonable basis to make any representations about Merrill's risk profile, which was high and had become worse, rather than improved.

66.     After reviewing Merrill's internal documents which were made available by Merrill to BAC during the due diligence process, federal regulators determined that BAC's due diligence had been grossly deficient because, among other things, it failed to appropriately consider Merrill's risk profile.

67.     In the Federal Reserve memorandum titled "Analysis of Bank of America & Merrill Lynch Merger" (the "Federal Reserve Merger Analysis") dated December 21, 2008, federal regulators concluded that Merrill's "single largest area of risk exposure and driver of recent losses…were clearly shown in Merrill Lynch's internal risk management reports that BAC reviewed during their due diligence." Further, after Lewis threatened to invoke the MAC clause due to Merrill's mounting losses, senior officials from the Federal Reserve concluded that the balance of Merrill's "risk exposures cited by management…should also have been reasonably well understood, particularly as BAC itself is also active in [] these products." Thus, these officials concluded that BAC's failed to accurately understand Merrill's exposures at the time of the merger announcement which "implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition."

68.     Lewis himself acknowledged that BAC's due diligence was grossly inadequate. When Lewis originally approached Federal Reserve officials for a bailout on December 17, 2008, Bernanke informed him that, if he were to terminate the Merger, it would immediately reveal the falsity of his claims regarding "adequate due diligence." In a December 23, 2008 e-

mail, a Senior Vice President at the Federal Reserve, wrote to other senior Federal Reserve official that Lewis "is worried about stockholder lawsuits; knows they did not do a good job of due diligence and the issues facing the company are finally hitting home and he [Lewis] is worried about his own job after cutting loose some very good people."

69.     As a direct result of BAC's grossly deficient due diligence, Defendants' statements about Merrill's "dramatically" lower risk profile were made without any reasonable basis. As Thain further asserted in a speech given in September 2009, Lehman's bankruptcy filing on September 15, 2008 "would be catastrophic to Merrill Lynch because of the amount of bad assets we had on our balance sheet," which was "why we sold the company." Moreover, contrary to BAC's Class Period representation that Merrill had "dramatically" reduced its risk profile, in the Federal Reserve Merger Analysis, Federal Reserve officials concluded that Merrill maintained several large risk exposures and vulnerabilities that exposed it to significant losses. These exposures were so material that a senior official at the Federal Reserve stated in an e-mail that "Merrill is really scary and ugly."

**D.     The Merger Agreement is Filed with Materially False and Misleading Statements**

70.     On September 18, 2008, BAC and Merrill filed copies of the Merger Agreement on Form 8-K, which summarized the terms of the Merger.  The Merger Agreement failed to disclose that BAC had permitted Merrill to pay bonuses before the Merger closed.  Instead, the Merger Agreement contained a materially misleading statement in a section entitled "Company Forbearances," which stated that without the prior consent of BAC, Merrill would not:

> (i) increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of [Merrill] or its Subsidiaries (collectively, "Employees"), [or] (ii) pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business).

71.    This statement was materially false and misleading because it represented that Merrill was prohibited from paying discretionary year-end bonuses before the time that the Merger closed when, in reality, BAC had already authorized Merrill to pay up to $5.8 billion of discretionary bonus compensation, and to do so on an accelerated schedule before the Merger closed.  Moreover, the statement falsely reassured investors that BAC had not consented to Merrill's payment of any bonuses before the Merger closed when, BAC had already granted its consent with respect to the payment of $5.8 billion of bonuses.

72.    The agreement allowing Merrill to pay up to $5.8 billion of bonuses pursuant to Merrill's VICP before the Merger closed was secretly memorialized in a side agreement called the "Company Disclosure Schedule."  While the Merger Agreement made generalized reference to this Disclosure Schedule, the Disclosure Schedule was not filed with the Merger Agreement, and its contents were never publicly disclosed to shareholders. Defendants' failure to either publicly file the Disclosure Schedule or summarize the contents of the secret bonus agreement in the Merger Agreement independently rendered the September 18, 2008 Forms 8-K materially false and misleading because it violated Item 601(b)(2) of Regulation S-K.

73.    The undisclosed bonus agreement was highly material because, among other reasons, (i) the amount set aside to pay bonuses constituted 12 percent of the entire Merger price and 30 percent of Merrill's shareholders' equity; (ii) the accelerated schedule deviated from Merrill's normal bonus schedule; (iii) the agreement meant that Merrill would pay billions of dollars in bonuses despite the fact that it lost more than $15 billion in the fourth quarter; and (iv) the payment of these bonuses before the Merger closed ensured that BAC shareholders would receive an asset worth billions of dollars less than originally valued.

E.    **BAC Makes Materially False Statements and Omissions About Its Own Financial Condition**

74.    Throughout October 2008, Defendants made numerous disclosures regarding the financial conditions of both BAC and Merrill and BAC conducted a secondary stock offering. In spite of the fact that Merrill was suffering through the worst month in its history, with October losses of $4.5 billion and continuing to mount, BAC investors continued to be kept in the dark and/or misled by Defendants regarding the following material facts: (a) BAC's due diligence of Merrill was grossly inadequate; (b) the amount of toxic assets on Merrill's balance sheet were so substantial that BAC's net capital position would have been jeopardized and BAC would be unable to absorb them absent a Government bailout; (c) Merrill and BAC had agreed to pay $3.6 billion in Merrill bonuses prior to the closing of the Merger; (d) the billions of dollars of losses suffered by both Merrill and BAC; and (e) that federal regulators had exerted pressure on the companies to quickly negotiate a deal.

75.    On October 6, 2008, BAC reported a substantial decline in earnings as compared to the previous year and that it planned to raise additional capital in its quarterly financial earnings press release.  Specifically, BAC announced:

> The company also announced two initiatives to raise capital, targeting an 8 percent Tier 1 capital ratio. The company intends to sell common stock with a target of raising $10 billion. In addition, the Board of Directors has declared a quarterly dividend on common stock of $0.32 to be paid on December 26, 2008 to shareholders of record on December 5, 2008. Assuming the current number of issued and outstanding shares, the reduction from $0.64 paid in recent quarters would add more than $1.4 billion to capital each quarter.

> "These are the most difficult times for financial institutions that I have experienced in my 39 years in banking," said Kenneth D. Lewis, chairman and chief executive officer. "We believe it is prudent to raise capital to very substantial levels in this uncertain environment. Both economic and financial market conditions have changed significantly in the last two months. We were willing to operate at capital levels over the short-term that were good, but not at our targeted levels, given projections two months ago. We now believe it is

22

important to be at or near our 8 percent Tier 1 capital ratio target given the recessionary conditions and outlook for still weaker economic performance which we expect to drive higher credit losses and depress earnings. We believe that achieving higher capital levels today will position our company to provide credit to those consumers and businesses that are attracted to our strength and stability.

\* \* \*

"All that said, **our company continues to be profitable, and we have been able in the last year to make a number of moves that should significantly enhance our earnings when economic and financial market conditions improve**. Our diversity and scale give us strength to deal with the current issues that few competitors can match. I have never been more optimistic about the long-term prospects of Bank of America.

76.     Following this partial disclosure, BAC common stock prices, and accordingly, options prices declined.  However, the price of BAC common stock and options nevertheless remained artificially inflated because Defendants failed to fully disclose BAC's true financial condition.

77.     The October 6th Press Release contained materially false and misleading statements.  Specifically it omitted information regarding BAC's exposure to credit markets and how changes in the market affected BAC and how this exposure could affect BAC's capital base. It also misstated the substantial negative effect the Merger would have on BAC's capital position and operations.   In the October 6th Press Release, Lewis underscored BAC's "strength and stability" and further averred that the Merger "should significantly enhance [BAC's] earnings." .

F.     **BAC Conducts a Secondary Offering**

78.     On October 7, 2008, BAC announced that it would issue 455 million shares of common stock at $22 per share (the "Secondary Offering").

79.     The Secondary Offering was conducted pursuant to BAC's Shelf Registration Statement dated May 5, 2006 and filed with the SEC (the "Secondary Offering Registration Statement"), and a Prospectus Supplement filed with the SEC on October 9, 2008 (the

"Prospectus Supplement") (collectively, the "October 9th Offering Documents").

80.    On October 19, 2008, BAC received approximately $25 billion in government aid pursuant to the United States government's Troubled Asset Relief Program ("TARP") (including $10 billion given to Merrill).  In light of its recent Secondary Offering, BAC assured investors of its financial strength by stating that it "did not need and did not seek" the capital infusion. Further, in an interview with CBS News, Lewis stated that Paulson forced him to accept the TARP funds with "no negotiations."  Lewis also said "that this was the right thing for the American financial system, and therefore it was the right thing for America" and that while he did not need the money he would "use it to grow loans and make more net income."

81.    The October 9th Offering Documents contained materially false and misleading statements.  Specifically they omitted information regarding BAC's exposure to credit markets and how changes in the market affected BAC by the time of the offering and how this exposure could affect BAC's capital base.  It also misstated the effect the Merger would have on BAC's capital position and operations, in light of Merrill's toxic assets mounting losses.

### G.    Merrill's Third Quarter 2008 Press Release is Materially False and Misleading

82.    On October 16, 2008, Merrill issued a press release announcing its financial results for the third quarter (the "October 16th Press Release"), which included a net loss of $5.2 billion.  In the press release Thain tried to explain that the $5.2 billion loss was a positive development, and highlighted that the loss was caused by aggressively selling risky assets in order to strengthen Merrill's balance sheet before the merger.  Thain misleadingly stated that Merrill "continued to reduce exposure and de-leverage the balance sheet prior to the closing of the [BAC] deal" and that, as a result "we believe even more that the transaction will create an unparalleled global company with pre-eminent scale, earnings power and breadth."

83.     In response to Merrill's announcement, analysts concluded that Merrill had significantly improved its financial condition in preparation for the merger with BAC, and believed that Merrill would make a profit in the fourth quarter.  However, the bleeding was only getting worse.

84.     The statements in the October 16th Press Release were materially false and misleading.  The statement that Merrill was continuing to "reduce exposures and de-leverage the balance sheet" was materially false and misleading because, notwithstanding its purported efforts to "reduce exposures" and "de-leverage the balance sheet," Merrill retained large amounts of toxic assets on its balance sheet that caused $4.5 billion of losses in October alone and losses of more than $15 billion in the fourth quarter.

85.     Unbeknownst to BAC's shareholders, throughout the fourth quarter of 2008, Merrill was continuing to suffer losses so large that the viability of the combined company would be threatened if the Merger were approved according to its original terms.

86.     On December 8, the Merrill Board gathered at Merrill's headquarters in New York for its final meeting and heard a chilling report.  Losses for October and November already amounted to approximately $7 billion; a figure exceeding the projections for the entire fourth quarter.  Further, the losses continued to balloon throughout December, ultimately reaching more than $15 billion.

87.     These undisclosed losses were material to BAC shareholders and investors.  The undisclosed losses were large enough to potentially bankrupt Merrill, and so large that BAC did not have enough capital to absorb them.  Investors had no reason to expect these losses in light of Merrill's statement in the October 16th Press Release highlighting its "significant progress in balance sheet and risk reduction."

**H.    BAC Senior Officers Were Fully Aware Of Merrill's Huge Losses Before The Shareholder Vote, And Considered Invoking the MAC**

88.    Several days after the announcement of the shareholders' approval of the Merger, BAC's 200 member transition team, which included Defendant Cotty, BAC's Chief Accounting Officer, who became Merrill's CFO, arrived at Merrill and began to work toward combining the two companies. The team involved itself in nearly every aspect of Merrill's operations and tracked Merrill's financial condition daily.

89.    Cotty acted as direct liaison between Lewis and Thain. Accordingly, Defendants' Lewis, Thain and Cotty knew of Merrill's fourth quarter losses as they occurred. In Thain's deposition testimony in connection with the NY AG's investigation, he stated that Merrill held meetings every Monday to discuss the prior week's financial results, and "[t]he acting chief financial officer, Neil Cotty, sat in meetings and discussions and was totally up-to-speed on what was happening."

90.    During an interview on *PBS Frontline*, Thain further explained that Merrill and BAC received daily updates regarding Merrill's financial condition:

> Question:    And was Bank of America inside your books? ... Would they have known what was happening, what the projections were, how bad things actually were because of the Lehman collapse and what else had happened in the market?
>
> Thain:    Yes, absolutely. I believe in being totally transparent. They had acquired us. We were completely transparent with them. They had inserted the person who had been their chief accounting officer -- he became the acting chief financial officer for the Merrill businesses. We generate a daily profit and loss statement. They were getting that daily profit and loss statement, so they knew about the losses at the same time we did.
>
> Question:    Which was when?
>
> Thain:    We get an update every day.

26

| Question: | So they would have known all the way along? |
| Thain: | All the way along. |
| Question: | Step by step. |
| Thain: | Yes. |

91.     Although Lewis initially said that he was surprised by the size of Merrill's fourth quarter losses, he has since admitted in sworn testimony in a hearing before Congress that he was aware of the losses during the fourth quarter.  During the hearing, a Representative asked Lewis "[i]sn't it true that Bank of America examined Merrill Lynch's book of business before signing the Merger Agreement, and then received detailed financial reports every week from Merrill Lynch after signing the Merger Agreement on September 15th?"  To which Lewis responded, "[t]hat is true."

92.     Congress' investigation found that "the Fed believed [Lewis] should have understood the potential for losses at Merrill because [his] own portfolio was similar to Merrill's."

93.     Additionally, Lewis led weekly conference calls during which he and Price discussed Merrill's growing losses.  On September 17, 2009, *The Wall Street Journal* reported that "[b]efore the shareholder vote, directors participated in weekly conference calls led by Mr. Lewis that included updates from the bank's finance chief, Joe Price, on Merrill's estimated fourth-quarter losses[.]"

94.     Due to Merrill's shockingly large fourth quarter losses, BAC executives considered invoking the MAC clause of the Merger Agreement prior to the shareholder vote.  According to the NY AG's investigation, Price along with other BAC senior executives discussed "whether Bank of America had a MAC in light of Merrill's deteriorating financial

condition" on three separate occasions in the weeks before the shareholder vote.  On each of these occasions, Price and the other BAC senior executives "deci[ded] not to disclose these escalating losses."

95.     However, according to a *Wall Street Journal* article, dated February 5, 2009, "[t]here was a disagreement inside the bank about whether to tell the shareholders about Merrill's losses."  As Dan Fitzpatrick, explained on *PBS Frontline*, "there were people inside Bank of America who felt like this number was big enough to disclose, that investors should know about this before they vote."

**I.     Merrill's Billion Dollar Bonuses Are Finalized**

96.     Although the financial conditions of Merrill and BAC were declining, the companies, specifically Thain and BAC's Chief Administrative Officer Steele Alphin ("Alphin"), finalized the determination of Merrill's $3.6 billion bonus pool.

97.     The two companies agreed that the Merrill bonuses would be paid out prior to the scheduled close of the deal.  Indeed, Thain testified that "the expectation was that the bonuses would be paid prior to the deal closing; the expectation was that the deal would close on or about December 31, and [the year-end calendar] is consistent with that."

98.     Throughout this entire process, BAC had access to information regarding the bonuses.  According to Thain's testimony "[o]ur behavior with them was complete transparency.  They provided input to what the ultimate [bonus] number was; they changed the mix of cash and stock – we changed it at their request – and they had access to name-by-name compensation figures.  So they were an integral part of the process of determining both what the ultimate pool size was and what individuals got."

### J.    BAC Files the Misleading Merger Registration Statement

99.    On October 2, 2008, in connection with the issuance of BAC common stock to then current Merrill shareholders under the terms of the Merger, BAC filed with the SEC a Registration Statement that contained materially false representations and omissions. The Registration Statement contained a Joint Proxy Statement (the "Joint Proxy Statement") that constituted a prospectus (collectively the "Merger Registration Statement"). The Merger Registration Statement was amended on October 22 and again on October 29. The Merger Registration Statement became effective on October 30, 2008.

100.    The Joint Proxy Statement which incorporated various SEC filings, including Form 10-Qs for the third quarter of 2008, failed to disclose any of the foregoing information: (a) the billions of dollars of losses suffered by Merrill and BAC and enormous losses that were mounting daily as the quarter progressed; (b) that Merrill's assets were so complex and illiquid that it was difficult to value the company with any degree of specificity; (c) that the value of Merrill's assets were substantially less than stated; (d) that Merrill and BAC had agreed to pay $3.6 billion in Merrill bonus prior to the closing of the Merger; (e) that BAC's due diligence in connection with the Merger was grossly inadequate; and (f) that federal regulators had exerted pressure on the companies to quickly negotiate a deal.

101.    On October 31, 2008, BAC and Merrill mailed the Joint Proxy Statement to their shareholders outlining the background and terms of the Merger and recommending that stockholders vote to approve the transaction. On November 3, 2008, the final version of the Joint Proxy Statement was filed with the SEC.

102.    According to the Joint Proxy Statement, each of the Merrill Lynch Board of directors and the Bank of America Board of directors approved the Merger Agreement according

to its stated terms.

103.    Although the Merger Registration Statement and Joint Proxy Statement identified certain "Risk Factors", none of the factors identified or explained that Merrill's assets were so complex and illiquid that it was difficult to value the company with any degree of specificity. The Joint Proxy Statement also concealed that the value of Merrill's assets were substantially less than stated.

104.    Under the heading "INFORMATION ABOUT THE COMPANIES", information was provided regarding Merrill's third quarter results.   However, when Defendants became aware of Merrill's staggering losses in the fourth quarter, Defendants failed to update, amend or correct the Joint Proxy Statement to disclose that BAC had become aware of the losses and that it had considered walking away from the Merger, invoking the MAC clause.

105.    The Merger Registration Statement and Joint Proxy Statement also described the "Representations and Warranties" of BAC and Merrill.   There, Defendants assured investors that no "material adverse effect" has occurred between the date of the Merger Agreement and the date of the Merger's closing:

> The merger agreement contains customary representations and warranties of Merrill Lynch and Bank of America relating to their respective businesses. With the exception of certain representations that must be true and correct in all material respects (or, in the case of specific representations and warranties regarding the capitalization of Merrill Lynch, true and correct except to a de minimis extent), no representation or warranty will be deemed untrue, inaccurate or incorrect as a consequence of the existence or absence of any fact, circumstance or event unless that fact, circumstance or event, individually or when taken together with all other facts, circumstances or events, has had or would reasonably be expected to have a material adverse effect on the company making the representation.

106.   BAC and Merrill each stated that it had made representations and warranties to the other regarding, among other things, capitalization, financial statements, internal controls and accounting or auditing practices, and "**the absence of adverse changes**."

107.   The Joint Proxy Statement affirmatively represented that Merrill would not make any discretionary bonus payments before the Merger closed on January 1, 2009.   Specifically, the Joint Proxy Statement identified discretionary compensation and benefits as an "extraordinary action[]" and assured investors that Merrill would not pay any compensation "except as required under applicable law...."

108.   The Merger Agreement, attached to the Proxy as Appendix A, repeated the assurances regarding discretionary compensation originally contained in the Form 8-K filed on September 18, 2008, described above.   Through the incorporation of Merrill's prior SEC filings, including the March 2008 Proxy, the Joint Proxy Statement falsely assured investors that annual bonuses are "paid in January for performance in the prior fiscal year."

109.   In addition to the failure to disclose the items set forth in ¶ 100, the statements in the Joint Proxy Statement were also materially misleading because: (1) contrary to the statements in the Joint Proxy Statement, Merrill and BAC had suffered material adverse changes to their financial conditions; (2) despite the undisclosed mounting losses at BAC and Merrill, the Joint Proxy portrayed the financial condition of the combined company as strong; (3) the Joint Proxy failed to disclose that BAC had agreed to allow Merrill to pay up to $5.8 billion in bonuses before the merger closed; and (4) the Joint Proxy incorporated Merrill's March 2008 Proxy, which made other false representations about bonus awards, including that they would be paid in January.

110.    The Joint Proxy Statement also failed to mention a pending write-down, or impairment, of goodwill on a Merrill business unit, FICC (fixed income), that had the effect of increasing losses by $2.3 billion.  Merrill's third quarter 10-Q, incorporated by reference into the Joint Proxy Statement, notes that "[a]t September 26, 2008, Merrill conducted an annual goodwill impairment test [...] Based on this analysis, Merrill Lynch determined that there was no impairment of goodwill."

111.    The 10-Q noted that while no impairment was found at quarter-end based on its analysis of goodwill, nonetheless, "given the continued challenging conditions in the financial markets and the related impact on the market value of financial institutions, we will perform an interim impairment test for goodwill in the fourth quarter of 2008, which could result in an impairment charge."   While Merrill added this broad language about its testing, it did not disclose any specific impairment figure.

### K.    Defendants Become Aware Of More Than $2 Billion In Further Losses Attributable To A Goodwill Impairment

112.    By November 13, Defendant Price knew that a significant reduction in the goodwill assets of Merrill's FICC (fixed income) division would have to be taken.  That day, Price met with Cotty and others where a presentation regarding the impending goodwill charge and raised the issue of whether it should be disclosed.

113.    By the start of the fourth quarter, it was clear to Merrill's auditors that it would be forced to take an impairment charge in the fourth quarter of 2008.  Thomas Kaylor, a valuation specialist specifically charged with analyzing the goodwill writedown, testified that he believed as early as the start of the fourth quarter 2008 that Merrill would be taking an impairment charge in the fourth quarter.  He said that "there was enough bad news that I don't think there was any question as to what was going to happen given how close it was in the third quarter and how bad

it got in the fourth quarter."   Another auditor from Deloitte & Touche, Thomas Graham, also testified that it was apparent the charge would have to be taken before the shareholder vote.

114.   Graham had sent others at Merrill an abbreviated analysis on November 13, indicating that a charge was likely. According to David Moser, the Chief Accounting Officer at Merrill, he "had a pretty good feeling . . . probably around November 20th, that we would be taking some kind of charge."

115.   By November 20, Moser had identified the amount.   On that day, he wrote that "[w]e have begun the goodwill impairment process ... we will be taking a significant write-off of the goodwill, almost certain all of ficc and ibk (approximately 2.2 billion.)" The amount eventually written down was $2.3 billion.

116.   At this point, Nancy Meloth, head of Corporate Planning in Merrill's Finance Department, began warning that goodwill was not included in her reports tracking Merrill's losses.  She did so first in a November 20 e-mail attaching a November 19 report, explaining that it "[d]oes NOT include potential goodwill impairment discussed earlier this afternoon."  By at least December 2, the reports of Merrill's losses warned of the exclusion of goodwill: "FY08 forecast does not include 4Q expenses for potential goodwill impairment." This warning, however, was empty.  BAC and Merrill both knew that the charge would have to be taken; it was the number itself that should have been added.

117.   Despite these developments, at no time prior to the shareholder vote did Price or Cotty ever request that the charge be accounted for in the Merrill performance reports. Had they done so, an extra $2.3 billion loss would have been reflected in Merrill's financials as early as mid-November, well before the shareholder vote.  In fact, the charge was left out until it was convenient to support BAC's claim for aid from the federal government, as discussed below.

L.     **The Proxy Supplements Are False And Misleading**

118.    Pursuant to Rule 14a-9, Defendants were under a continuing duty to update and correct the Joint Proxy to disclose the material adverse facts set forth above.

119.    On November 21, 2008, BAC and Merrill filed a Proxy Supplement on a Form 8-K updating the Joint Proxy to disclose that they had settled certain derivative litigation relating to the Merger and, as a condition of the settlement, agreed to make certain disclosures related to the background of the Merger.  There was no disclosure of Merrill's losses, the bonus agreement, or BAC's deteriorating financial condition.

120.    Similarly, on November 26, 2008, BAC filed a letter with the SEC pursuant to Rule 14a-6(b) to supplement the Joint Proxy.  The letter from Lewis to shareholders falsely assured them that BAC's financial condition was strong despite the deteriorating market conditions.  The letter was written expressly in response to investors' "deep concerns" about, among other things, "whether financial institutions have enough capital."  Lewis falsely represented that BAC was "one of the most liquid banks in the world" and "one of the strongest and most stable major banks in the world." Lewis further represented that BAC possessed "more than adequate capital" and that BAC "did not need" the federal bailout money.  None of the materially adverse conditions set forth in ¶¶ 100, 109-110 were disclosed.

121.    These statements were also materially false and misleading because BAC was thinly capitalized, was about to take on massive amounts of risky deteriorating assets from Merrill with mounting losses, and was not prepared for further deterioration of its capital position.

**M.    The December 5th Press Release Contained Materially False and Misleading Information**

122.    On December 5, 2008, BAC and Merrill shareholders voted and approved the Merger. BAC issued a press release (the December 5th Press Release") regarding the Merger in which Lewis falsely stated that the Merger would create the "premier financial services franchise" in the world.

123.    The statements made in the press release were false and misleading because they did not disclose any of the material adverse facts set forth above, including that: (i) Merrill had already suffered more than $7 billion in losses and impairments in October and November, with billions more projected for December; (ii) BAC had already suffered almost $800 million in losses and was expecting a $1.4 billion quarterly loss; (iii) BAC was very thinly capitalized, and was not prepared for further deterioration; and (iv) BAC lacked the capital to absorb Merrill's losses without massive amounts of Government aid.

124.    Lewis acknowledged that BAC lacked the capital to absorb Merrill's losses when, mere days after issuing the statements set forth above, he decided to terminate the merger or, alternatively, seek a $138 billion taxpayer bailout to rescue BAC from collapse.

125.    In the days following the shareholder vote, Defendant Price gave a detailed presentation to BAC's board of directors about its financial condition and Merrill's fourth quarter staggering losses. Specifically, they were informed that Merrill had lost several billion of dollars more since December 8, 2008.

**N.    BAC Considers Invoking the MAC Clause**

126.    Immediately after learning of Merrill's staggering losses Lewis met with counsel to determine whether BAC had grounds to exit the Merger by invoking the MAC clause.

127.   Following several days of consultation, Lewis informed Paulson on December 17, 2008 that BAC was seriously considering invoking the MAC clause.  That evening Lewis and Price met with Paulson, Bernanke and other officials to discuss BAC's possible termination of the Merger.

128.   During the meeting, Lewis stated that BAC was projected to lose $1.4 billion in the fourth quarter and that Merrill's losses were so large that they threatened the solvency of BAC.

129.   On December 19, 2008 Lewis and Price spoke with Paulson, Bernanke and other Treasury and Federal Reserve officials.  Merrill was now projected to have fourth quarter losses in excess of $15 billion, and BAC was considering invoking the MAC clause.  Paulson asked Lewis what he would need to complete the Merger.  Lewis suggested that the Government provide additional capital and protection against future losses on Merrill's assets.

130.   Bernanke testified before Congress that he told Lewis that "an attempt [by BAC] to invoke the MAC clause after three months of review, preparation and public remarks by the management of Bank of America about the benefits of the acquisition would cast doubt in the minds of financial market participants, including the investors, creditors and customers of Bank of America about the due diligence and analysis done by the company, its capacity to consummate the significant acquisitions, its overall risk management processes and the judgment of its management."

131.   On December 21, 2008, despite the Government officials' urging to the contrary, Lewis told Paulson that BAC still wanted to exit the Merger.  Paulson told Lewis that if BAC invoked the MAC clause its management and board would be replaced.  According to Paulson's testimony before Congress:

It was . . . appropriate for me to remind him under such circumstances [that] the Federal Reserve could invoke its authority to remove management and the board of Bank of America.  I intended my message to reinforce the strong view that had been expressed by the Fed and which was shared by the Treasury that it would be unthinkable that Bank of America take this destructive action.

132.    Paulson's threat had its intended effect and Lewis did not invoke the MAC clause. Lewis admitted that Secretary Paulson's threat changed his mind about invoking that MAC clause and terminating the Merger.

133.    That day, Lewis told Secretary Paulson and Chairman Bernanke separately that BAC would proceed with the Merger and would work with federal regulators on designing a bailout package.  Lewis made the decision to proceed with the Merger even though he knew that the impact of Merrill's losses would harm BAC shareholders.  Specifically, at his deposition, Lewis was asked whether BAC's shareholders were "being forced to take a good part of the hit of the Merrill losses," and if this "hit" would harm them. He responded that BAC's investors were harmed over the "short term," which he defined as "[t]wo to three years."

134.    The following day, December 22, 2008, Lewis met with the BAC board to ensure that the board agreed with management's recommendation to go forward with the Merger as scheduled pursuant to the terms agreed to in September.  The board minutes from that meeting state that the Board "clarif[ied] that [it] was not persuaded or influenced by the statement by the federal regulators that the Board and management would be removed by the federal regulators if [BAC] were to exercise the MAC clause and failed to complete the acquisition of Merrill Lynch."

135.    During a Board meeting held on December 30, 2008, Lewis stated that if it were not for the significant concerns for the financial system and the adverse situation expressed by the federal regulators, BAC would "in light of the deterioration of the operating results and

capital position of Merrill Lynch, assert the material adverse change clause in its Merger

Agreement with Merrill Lynch and would seek to renegotiate the transaction."

136.   Lewis attempted to obtain protection from the Government against potential

investor lawsuits.  According to a December 22, 2008 e-mail from Bernanke to Alvarez, Lewis

had confirmed his willingness to drop the invocation of the MAC clause, but "he fears lawsuits

from shareholders for NOT invoking the MAC, given the deterioration at [Merrill]."  As such,

Lewis asked Bernanke "whether he could use as a defense that the [Government] ordered him to

proceed for systemic reasons."  Bernanke said "no."

137.   Bernanke subsequently asked Alvarez whether the Federal Reserve supervisors

could formally advise Lewis that invoking the MAC clause was not in the best interests of BAC,

and whether Lewis could use such a letter as a defense from suit.  Alvarez responded that such a

letter was not "appropriate" and that Lewis was exposed to liability for BAC's lack of

disclosures to shareholders in advance of the shareholder vote. Alvarez wrote:

> Management may be exposed if it doesn't properly disclose information that is
> material to investors. There are also Sarbanes-Oxley requirements that the
> management certify the accuracy of various financial reports. . . . His potential
> liability here will be whether he knew (or reasonably should have known) the
> magnitude of the [Merrill] losses when BAC made its disclosures to get the
> shareholder vote on the [Merrill] deal in early December.

138.   In a follow-up e-mail to Bernanke on this subject, Alvarez specifically noted that

Federal Reserve officials' conclusions about Lewis's knowledge of Merrill's losses before the

shareholder vote caused "problems" for Lewis under the securities laws:

> [O]nce we're in the litigation, all our documents become subject to discovery and,
> you'll remember from Deborah's presentation, some of our analysis suggests that
> Lewis should have been aware of the problems at [Merrill] earlier (perhaps as
> early as mid-November) and not caught by surprise. That could cause other
> problems for him around the disclosures [BAC] made for the shareholder vote.

139.   Bernanke and Paulson both encouraged Lewis not to invoke the MAC clause reasoning that such conduct would have serious repercussions for both BAC and Merrill.  In response, they promised BAC additional governmental assistance.

**O.    Federal Regulators Do Not Believe Lewis' "Surprise" Regarding Merrill's Fourth Quarter Losses Or That BAC Conducted Adequate Due Diligence**

140.   After reviewing Merrill's data, senior Federal Reserve officials expressed their disbelief regarding Lewis' claims that he was recently surprised by the size of Merrill's losses. On December 19, 2008, a Senior Advisor in the Federal Reserve's Division of Bank Supervision and Regulation, sent an e-mail to other Federal Reserve officials stating that Merrill's losses were clear from the beginning of the fourth quarter, and that claims of surprise were doubtful:

> General consensus forming among many of us working on this is that given market performance over past several months and the clear signs in the data we have that deterioration at [Merrill Lynch] has been observably under way the entire quarter - albeit picking up significant[ly] around mid-November and carrying into December - **Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect. At a minimum, it calls into question the adequacy of the due diligence process BAC had been doing in preparation for the takeover.**

141.   As the e-mail above describes, after viewing BAC's internal data and Merrill's losses, Federal Reserve officials concluded that, contrary to BAC's public statements, the due diligence BAC had conducted with regarding to Merrill and the Merger was substantially deficient.

142.   On December 20, 2008, Federal Reserve official Deborah Bailey sent an e-mail stating, "I always had my doubts about the quality of the due diligence they did on the [Merrill] deal.  How do you pay a premium and now ask for help?  This will not go over well at all."

143.   Senior Federal Reserve officials repeated these conclusions in the Federal Reserve Merger Analysis, which stated:

> While the extent of the market disruptions that have occurred since mid-September were not necessarily predictable, **BAC management's contention that the severity of [Merrill's] losses only came to light in the recent days is problematic and implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition.**

144.   According to the Federal Reserve Merger Analysis, BAC had failed to adequately consider or assess Merrill's largest risk exposures.  As that analysis stated, the "single largest area of risk exposure and driver of recent losses that have been identified by management" was Merrill's "potentially large losses stemming from exposures to financial guarantors."  These exposures and losses, Federal Reserve officials concluded, "were clearly shown in Merrill Lynch's internal risk management reports that BAC reviewed during their due diligence."  Additionally, Federal Reserve officials concluded that Merrill's "risk exposures cited by management . . . should also have seen reasonably well understood, particularly as BAC itself is also active in [] these products."

145.   The Federal Reserve Merger Analysis highlighted the "problematic" nature of Lewis' claim of surprise given that the Joint Proxy Statement "explicitly assert[ed] that [BAC] has an understanding of [Merrill's] business activities, financial condition and prospects as well as an understanding of the outlook for the firm based on prospective economic and market conditions."

146.   Notes from the Federal Reserve state that Lewis acknowledged to Federal Reserve officials that BAC had not conducted adequate due diligence.  An internal Federal Reserve e-mail dated December 23, 2008 stated, "I think [Lewis] is worried about stockholder lawsuits; knows they did not do a good job of due diligence and the issues facing the company are finally hitting home and he is worried about his own job after cutting loose some very good people."

**P.**   **Because BAC Is Unable to Absorb Merrill's Losses, Lewis Seeks and Receives A Huge Taxpayor Bailout Without Disclosing Such Material Facts to Shareholders.**

147.   To proceed with the Merger, Lewis requested and received from the Government, a $138 billion taxpayer bailout, comprised of a $20 billion capital infusion in exchange for a sale of preferred stock, and a guarantee against losses on $118 billion of high-risk assets, the large majority of which came from Merrill.

148.   Prior to the closing of the Merger, Lewis asked the government to provide BAC with a written confirmation of the additional aid the government would give BAC, however, Paulson stated that a written confirmation could not be provided without making a public disclosure.

149.   During an investigation into the facts surrounding the Merger conducted by the NY AG, Lewis testified that although the board did not discuss the issue of disclosure to shareholders, Lewis sent an e-mail to the Board on December 22 stating that he did not want to make any public disclosures.  Specifically, the e-mail said, "I just talked with Hank Paulson.  He said that there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure, which of course, we do not want."

150.   In a BAC board meeting on December 22, 2008, Lewis informed the board that he and Government officials had agreed to this bailout package. According to the meeting minutes, Lewis informed the BAC board that (i) "the Treasury and the Fed have confirmed that they will provide assistance to the Corporation to restore capital and to protect the Corporation against the adverse impact of certain Merrill Lynch assets;" (ii) "the Corporation can rely on the Fed and Treasury to complete and deliver the promised support by January 20, 2009, the date scheduled for the release of earnings by the Corporation;" and (iii) Bernanke had confirmed that the Office

of the Comptroller of the Currency, FDIC the current and incoming Treasury officials, and the incoming economic team of the new administration are informed of the commitment to the Corporation by the Fed and Treasury and that all concur with the commitment of the combined federal regulators to BAC.

151.   On December 30, 2008, Lewis met with the BAC board to update them concerning the U.S. Government's commitment of TARP funds, and further underscored that the deal with the government was firm and detailed.  According to the minutes of this meeting, "management has obtained detailed oral assurances from federal regulators with regard to their commitment and has documented those assurances with e-mails and detailed notes of management's conversations with the federal regulators." Lewis "discussed in detail several of the conversations between Mr. Price and Mr. Warsh establishing essential elements of the commitment of the federal regulators including . . . the commitment of the federal regulators to deliver assistance in the form of capital and asset protection to the Corporation." Lewis added that:

> [M]anagement of the Corporation had clearly explained to the federal regulators the terms and conditions required by the Corporation to consummate the acquisition of Merrill Lynch on January 1, 2009. In return, he reported, management has received strong assurances from all relevant federal regulators and policy makers that the Corporation will receive adequate and appropriate assets to neutralize the impact to the financial condition of the Corporation resulting from the Corporation's acquisition of Merrill Lynch on January 1, 2009.

152.   The December 30, 2008 BAC Board minutes confirm that BAC purposefully delayed the disclosure of Merrill's losses and BAC's receipt of additional TARP funds until it announced its earnings in January 2009.  Specifically, the minutes state "Mr. Lewis concluded his remarks by stating that management will continue to work with the federal regulators to transform the principles that have been discussed into an appropriately documented commitment

42

to be codified and implemented in conjunction with [BAC]'s earning [sic] release on January 20, 2009."

153.    The NY AG's investigation further confirmed that, following the shareholder vote, Defendants concealed numerous, highly material facts. According to the NY AG's September 8, 2009 letter:

> Bank of America failed to disclose that it had determined, eight business days after the merger was approved, that it had a legal basis to terminate the merger because of Merrill's losses. Indeed, Bank of America only decided against seeking to terminate the merger when the jobs of its officers and directors were threatened by senior federal regulators. Yet it took Bank of America more than a month to make public disclosure of its dire financial situation – a month during which millions of shares of Bank of America stock were traded based on entirely inaccurate and outdated financial information. Bank of America further failed to disclose that its officers faced a conflict of interest in responding to the federal government's threat, or that it had received the government's oral commitment to support the merger with taxpayer funds.

**Q.    The Merger Closes Without Disclosure of the Enormous Losses Suffered, the Accelerated Bonus Payment to Merrill Executives, and the Taxpayor Bailout**

154.    On January 1, 2009, the Merger closed according to the terms disclosed on September 15, 2008.  BAC issued a press release (the "January 1 Press Release") without disclosing: (i) Merrill's fourth quarter loss of more than $15 billion; (ii) BAC had suffered a fourth quarter net loss of $1.8 billion; and (iii) to prevent BAC from collapsing under the weight of these enormous losses, it required a $138 billion taxpayer bailout.

155.    The January 1 Press Release specifically stated:

"We created this new organization because we believe that wealth management and corporate and investment banking represent significant growth opportunities, especially when combined with our leading capabilities in consumer and commercial banking," said Bank of America Chairman and Chief Executive Officer Ken Lewis. "We are now uniquely positioned to win market share and expand our leadership position in markets around the world."

Bank of America will have the largest wealth management business in the world with approximately 20,000 financial advisors and more than $2 trillion in client