assets. Global investment management capabilities will include approximately 50 percent ownership in BlackRock Inc., which at September 30 had $1.26 trillion in assets under management. Bank of America had $564 billion in assets under management in the same period.

The combination also adds strengths in debt and equity underwriting, sales and trading, and merger and acquisition advice, creating significant opportunities to deepen relationships with corporate and institutional clients around the globe.

Under terms of the agreement, shareholders of Merrill Lynch received .8595 shares of Bank of America common stock for each common share of Merrill Lynch.

As previously announced, Bank of America expects to achieve $7 billion in pre-tax expense savings, fully realized by 2012. Cost reductions will come from a range of sources, including the elimination of positions announced on December 11, and the reduction of overlapping technology, vendor and marketing expenses. In addition, the company is expected to benefit by leveraging its broad product set to deepen relationships with existing Merrill Lynch customers.

156.    Based on BAC's false representations to the market as of January 1, 2009, analysts had previously estimated that BAC would independently report earnings of $0.08 per share for the fourth quarter of 2008. A January 10, 2009 internal Federal Reserve memo entitled "Considerations regarding invoking the systemic risk exception for Bank of America Corporation" underscored the fact that Defendants' recent statements had misled investors into believing that the combined company was financially healthy. Specifically, the memo stated: "[t]he earnings guidance provided by the firm to the investor community does not infer that 4Q performance at either organization will be as negative as we have been told. Further, a survey of equity analysts suggests that the investor community have [sic] significantly more positive expectations regarding fourth quarter performance."

**R.     The Truth is Revealed and BAC Stock Price Plummets**

> 1.  Investors Learn the Truth of Merrill's and BAC's Staggering Fourth
> Quarter Losses and BAC's Need for Government Assistance to Close
> the Merger

157.    Although BAC remained true to its plan to conceal the adverse information regarding Merrill and the Merger until it publicly reported earnings on January 16, 2009, news of the adverse information leaked into the market.

158.    On January 12, 2009 news that BAC would report higher losses than expected losses began to leak into the market when a Citigroup analyst wrote than BAC might post a $3.6 billion fourth-quarter loss and cut its dividend from $0.32 to $0.05 per share.  In response, shares of BAC stock fell from $12.99 at the close of the market on the prior trading day to $11.43 on January 12 – a 12 percent drop, which also negatively impacted the price of BAC options.

159.    According to a June 1, 2009 *Sydney Morning Herald* article, on January 14 – which was January 13 in New York – Merrill executives in Australia had informed Australian bond traders that "[t]he market is expecting Merrill Lynch in New York to come out with a bad result on Thursday night. It's not going to be bad, it's going to be awful and this market is going to plummet on Friday and may fall leading up to the result, as it will start to leak out."  BAC shares dropped from a close of $11.43 on January 12, 2009 to a close of $10.65 on January 13, 2009 and dropped again to close at $10.20 on January 14, 2009, all on heavy volume – a decline of approximately 11 percent over the three days, also negatively impacting the price of BAC options.

160.    On January 15, 2009, to the surprise of investors, the *Wall Street Journal* reported that "[t]he U.S. government is close to finalizing a deal that would give billions in additional aid to the Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co." citing

larger-than-expected but unquantified fourth quarter losses.  In turn, BAC announced that it would move its fourth quarter and full-year 2008 earnings call to January 16, 2009, four days earlier than planned.  The price of BAC stock fell from $10.20 per share on January 14, 2009 to close at $8.32 per share on January 15, 2009, on heavy trading volume – an 18 percent drop leaving BAC's share price at an 18-year low.

161.    On the morning of January 16, 2009 the Treasury Department issued a press release revealing the government bailout:

> Treasury and the Federal Deposit Insurance Corporation will provide protection against the possibility of unusually large losses on an asset pool of approximately $118 billion of loans, securities backed by residential and commercial real estate loans, and other such assets, all of which have been marked to current market value.  The large majority of these assets were assumed by Bank of America as a result of its acquisition of Merrill Lynch.  The assets will remain on Bank of America's balance sheet.  As a fee for this arrangement, Bank of America will issue preferred shares to the Treasury and FDIC.  In addition and if necessary, the Federal Reserve stands ready to backstop residual risk in the asset pool through a non-recourse loan.
>
> In addition, Treasury will invest $20 billion in Bank of America from the Troubled Asset Relief Program in exchange for preferred stock with an 8 percent dividend to the Treasury.  Bank of America will comply with enhanced executive compensation restrictions and implement a mortgage loan modification program.

162.    Later that morning BAC held a conference call concerning its fourth quarter financial results.  During the call, BAC revealed that (i) Merrill had suffered a fourth quarter loss of $15.31 billion; (ii) BAC had suffered a net loss of $1.8 billion in the fourth quarter; and (iii) the U.S. Government would provide a $20 billion capital injection in exchange for preferred stock, and had agreed to provide protection against further losses on $118 billion of risky assets, primarily from Merrill, for which the U.S. Government would charge a fee of $4 billion in exchange for preferred stock.  BAC further announced that it would cut its dividend from $0.32 to $0.01.

163.    Including the fourth quarter losses, Merrill had lost $24.44 per share for the year, and $9.62 per share for the quarter.  BAC's losses meant that it had lost $0.48 per diluted share, rather than the $.08 per share profit analysts expected.

164.    The $24 billion of preferred shares that BAC was required to sell to the U.S. Government under the terms of the bailout carried an 8 percent dividend rate, which would require BAC to pay almost $2 billion per year in dividends to the Treasury Department, thus severely reducing shareholder returns, and diluting the value of BAC common stock by approximately $0.30 per share for 2009.  BAC was required to pay the U.S. Government $236 million per year for the asset guarantee, as well as an unspecified fee when it desired to end the asset guarantee – all of which further reduced its future earnings and diluted the value of its common stock, thereby negatively impacting the price of BAC options.

165.    BAC's acceptance of the Government funding, on top of the TARP funds it had previously received, qualified it as a recipient of "extraordinary" Government aid, a status that was so unique that, apart from BAC, the only other "extraordinary" recipients were AIG and Citigroup. This designation, in turn, subjected BAC to additional Government oversight and restrictions.

166.    During BAC's fourth quarter conference call on January 16, 2009 (the "January 16th Conference Call"), Lewis asserted that he did not miss any problems at Merrill in conducting due diligence before entering into the Merger and admitted that Merrill's estimated $15.5 billion losses were anticipated.

167.    During the January 16th Conference Call, Lewis admitted that BAC was unable to absorb the Merrill losses without the taxpayer bailout:

> We went to our regulators and told them that we would not – that we could not close the deal without their assistance.  As a result, we have agreed to the issuance

of $20 billion in Tier 1 qualifying TARP preferred, as well as the issuance of an additional preferred of $4 billion in exchange for an asset guarantee . . . .

168.    This news shocked the investing public.  On January 16, 2009 Deutsche Bank reported that: "While core results [for Bank of America], esp. credit, are worse than expected, the main negative surprise related to the Merrill Lynch deal in terms of losses and new [government] involvement."

169.    As Lewis admitted on *PBS Frontline*, "[t]he magnitude of the loss, obviously, at Merrill Lynch really stunned people. And so it was a bad day and it did shock a lot of people and disappoint a lot of people."

170.    On January 16, 2009, after markets closed, it was reported that Moody's had downgraded BAC's credit ratings due to "the disclosure of substantial losses at Merrill Lynch," and Fitch had downgraded Merrill's individual rating to "F" due to its "massive losses" and its inability to "survive[] absent assistance provided by the U.S. Treasury."

171.    On Tuesday, January 20, 2009, J.P. Morgan reported that BAC's fourth quarter losses were "enormous:"

> [BAC] announced a major agreement with the U.S. government that reflected primarily the poor acquisition of [Merrill] done without due diligence as well as some assets from its own weakening portfolio. [Merrill] over-represented its value given its large amount of high risk assets and the level of permanent dilution for [BAC] from the acquisition will likely be higher.

172.    On January 20, 2009, based on the previously undisclosed information, analysts concluded that BAC would need to raise at least $80 billion to restore sufficient capital adequacy levels:  a feat that seemed nearly impossible given the status of the bank.  One analyst stated, "[i]t would take over $80 billion of new common equity to reach even the low end of the range, and we believe Bank of America simply is not generating sufficient capital internally in this environment to put a dent in this size capital hole."

173.    Following these disclosures, BAC stock price plummeted to $5.10 per share, down from a closing price of $8.32 per share on January 16, 2009, a loss of nearly 39 percent on heavy volume over two days of trading, thereby also negatively impacting the price of BAC options.

174.    In only six trading days between January 12, 2009 and January 20, 2009, as investors learned the truth about Merrill, BAC and the Merger, BAC stock plummeted from $12.99 to $5.10 – a decline of over 60 percent – causing a market capitalization loss of over $50 billion.   However, at this price, BAC stock remained artificially inflated because news of Merrill's accelerated bonus payments had not yet been disclosed.

      2.   Investors Learn the Truth of the Accelerated Payment of Merrill Executive and Employee Bonuses

175.    Just before midnight on January 21, 2009 the *Financial Times* broke the story of Merrill's accelerated bonus payments, reporting that Merrill had taken "the unusual step of accelerating bonus payment by a month last year."   The *Financial Times* further reported that that "a person familiar with the matter estimated that about $3bn to $4bn was paid out in bonuses in December" three days before the Merger closed.   Nancy Bush, an analyst with NAB Research, described the size of the 2008 Merrill bonus payments as "ridiculous."

176.    The following day, Lewis flew from Charlotte, North Carolina to New York City and fired Thain.   According to Thain's *PBS Frontline* interview, in a conversation that took "two minutes" Lewis told Thain: "[t]hings aren't going to work out. You are going to take the blame for the fourth-quarter losses, and you can never succeed me, and we're going to replace you."

177.    On January 23, 2009, the Associated Press reported that the revelation of the accelerated bonus payments amidst Merrill's losses triggered Thain's purported "resignation," writing, "John Thain resigned under pressure from Bank of America on Thursday after reports he

rushed out billions of dollars in bonuses to Merrill Lynch employees in his final days as CEO there, while the brokerage was suffering huge losses and just before Bank of America took it over."

178.    Following the *Financial Times* report, BAC and Merrill refused to disclose or confirm the size of the bonuses.  As the *Charlotte Observer* reported on January 23, 2009 BAC "wouldn't say how much Merrill Paid in bonuses" and it was impossible to determine the size of the bonus from Merrill's financial statements because the "number[s] includes salaries, bonuses, benefits, retirement payments, commission for financial advisors and severance for laid-off employees."

179.    The news of Merrill's bonus payments immediately triggered an investigation by the NY AG.  On January 23, 2009, *The New York Times* reported that the NY AG "is examining the payouts, which a person inside the office characterized...as 'large, secret last-minute bonuses.'"

180.    In a letter dated February 10, 2009 to Congress, the NY AG explained that:

Merrill Lynch had never before awarded bonuses at such an early date and this timetable allowed Merrill to dole out huge bonuses ahead of their awful fourth quarter earnings announcement and before the planned takeover of Merrill by Bank of America.

Merrill Lynch's decision to secretly and prematurely award approximately $3.6 billion in bonuses, and Bank of America's apparent complicity in it, raise serious and disturbing questions.

181.    In response to the disclosure of Merrill's huge, accelerated bonus payments, BAC fell 15 percent on heavy trading volume, dropping from a closing price of $6.68 per share on January 21, 2009 to a closing price of $5.71 per share on January 22, 2009.

182.    Ultimately, after full disclosure of BAC's and Merrill's losses, and the accelerated payment of Merrill's bonuses, BAC common stock fell 56 percent – from $12.99 per share on January 9, 2009 to $5.71 per share on January 22, 2009.

## V.    POST-CLASS PERIOD EVENTS

183.    The fallout from the conduct described herein continued beyond the Class Period, resulting in additional civil and criminal investigations at both the federal and state levels.  In addition to the NY AG's investigation, it was reported that a similar investigation was initiated by the Attorney General of North Carolina to determine, whether, among other things, Merrill and BAC had violated the state's laws against fraudulent transfers and civil racketeering.  The F.B.I. and the U.S. Department of Justice are also conducting criminal investigations into BAC's purchase of Merrill.

184.    Additionally, according to a *Wall Street Journal Article* dated July 16, 2009 in January 2009, the Federal Reserve and the Office of the Comptroller of the Currency downgraded the overall rating of BAC from "fair" to "satisfactory."  A letter reviewed by the *Wall Street Journal* sent by Federal Reserve officials explaining the action criticized BAC's management and directors for being "overly optimistic" about risk and capital. As the letter explained, "[m]anagement has taken on significant risk, perhaps more than anticipated at the time the acquisition was proposed," and, as a result, "more than normal supervisory attention will be required for the foreseeable future." As a result of these conclusions, in early May 2009, federal regulators imposed a "memorandum of understanding" on BAC that, among other things, required it to address its problems with liquidity and risk management.

185.    On February 10, 2009, the NY AG wrote a letter to Congress providing details on Merrill's accelerated bonus payments.  The letter described how Merrill's accelerated bonus

schedule had allowed it to reward top executives despite its massive losses – actions which the NY AG described as "nothing short of staggering." Specifically, the NY AG wrote:

> While more than 39 thousand Merrill employees received bonuses from the pool, the vast majority of these funds were disproportionately distributed to a small number of individuals. Indeed, Merrill chose to make millionaires out of a select group of 700 employees. Furthermore, as the statistics below make clear, Merrill Lynch awarded an even smaller group of top executives what can only be described as gigantic bonuses.

186.   On May 7, 2009, the U.S. Government revealed results of certain "stress tests" of large banks conducted by the Federal Reserve. BAC was deemed to need an additional $33.9 billion of Tier 1 common capital.

187.   In June, November and December 2009, the Domestic Policy Subcommittee of the Oversight and Government Reform Committee of the House of Representatives (the "House Subcommittee") held a series of hearings regarding the Merger, with a particular focus on Lewis' failure to disclose either Merrill's mounting losses or his arrangement to receive a Government bailout.

188.   During Lewis' testimony on June 11, 2009 before the House Subcommittee, Representative Dennis Kucinich ("Kucinich") told Lewis that, "[o]ur investigation, Mr. Lewis, also finds that Fed officials believe that you are potentially liable for violating securities laws by withholding material information in your possession from shareholders before the vote to approve the merger with Merrill Lynch on December 5th, 2008." Representatives Peter Welch and Elijah Cummins both repeatedly pressed Lewis on the lack of disclosure to shareholders. Representative Welch asked: "[d]id you tell your shareholders that you had come upon this information, that the deal they voted on is not the deal that was going through, because they had a $12 billion hole that was accelerating?"

189.    On August 3, 2009, the SEC filed a complaint against BAC in the United States District Court for the Southern District of New York, alleging that BAC had violated § 14(a) of the Exchange Act by misleading shareholders about the Merrill bonus agreement. The SEC charged in its complaint, although the Proxy had stated that Merrill would not pay year-end bonuses without BAC's consent, in fact, BAC had already consented to the payments as part of the Merger Agreement:

> The omission of Bank of America's agreement authorizing Merrill to pay discretionary year-end bonuses made the statements to the contrary in the joint proxy statement and its several subsequent amendments materially false and misleading. Bank of America's representations that Merrill was prohibited from making such payments were materially false and misleading because the contractual prohibition on such payments was nullified by the undisclosed contractual provision expressly permitting them.

190.    The day after the SEC filed its complaint, Kucinich wrote to Mary Schapiro, Chair of the SEC, to "request that the SEC expand its investigation into possible securities law violations committed by Bank of America in connection with its merger with Merrill Lynch." Kucinich explained that the House of Representatives' Domestic Policy Subcommittee of the Oversight and Government Reform Committee had "reviewed over 10,000 pages of confidential documents obtained from the Federal Reserve" and that:

> our investigation has revealed . . . [t]op staff at the Federal Reserve had concluded that Bank of America knew, as early as mid-November, about a sudden acceleration in the losses at Merrill Lynch, and [Federal Reserve] General Counsel Scott Alvarez believed that Bank of America could potentially be liable for securities laws violations for its failure to update its proxy solicitation and public statements it had made about the merger in light of information Bank of America possessed about Merrill's deterioration before the shareholder vote.

191.    On September 8, 2009, the NY AG sent a letter to BAC's outside counsel, which summarized the results of the NY AG's investigation and stated that it was in the process of "making charging decisions with respect to Bank of America and its executives." The letter

provided that, "[t]he facts of [Merrill's] cascading losses and bonus payments – and the facts of Bank of America's senior executives' knowledge of these events – are straightforward."

192.   The letter further provided that, "[o]ur investigation has found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers failed to disclose material non-public information to its shareholders," and did so knowingly, including their failure to disclose (i) at least "$14 billion" of Merrill's "losses prior to shareholder approval of the merger," about which "Bank of America knew;" (ii) "a goodwill charge of more than $2 billion associated with sub-prime related losses," which "was known of by November" 2008 but nevertheless lumped into Merrill's "purportedly 'surprising'" losses after the shareholder vote; (iii) Bank of America's determination, "eight business days after the merger was approved, that it had a legal basis to terminate the merger because of Merrill's losses," which it reversed only "when the jobs of its officers and directors were threatened by senior federal regulators;" and (iv) Merrill's "accelerated bonus payments," which "were not disclosed in the proxy materials even though they clearly should have been under the circumstances."

193.   On September 18, 2009, during a speech at the Wharton School of the University of Pennsylvania, Thain made it clear that BAC's claim that it lacked control over the bonuses paid to Merrill executives and employees was not true:

> [W]hen I got fired in January – when they said John Thain secretly accelerated these bonuses – they were lying. That has now trapped them into a lot of trouble because there is a piece of paper – there's a document – that says yes, they in fact agreed to this in September. So one take away for all of you is it's really always better to just tell the truth.

194.   On February 4, 2010, the NY AG filed a civil complaint against BAC, Lewis and Price for violations of New York's securities laws.

## VI.   **ADDITIONAL SCIENTER ALLEGATIONS**

195.   The facts alleged herein compel a strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that their statements set forth above were materially false and misleading when made.

196.   **First**, senior executives at BAC and Merrill had direct knowledge of Merrill's losses as they occurred but, when such information was learned, failed to disclose them to the investing public.  As alleged above, immediately following the announcement of the Merger on September 15, 2009, BAC's 200 member transition team, which included Defendant Cotty, were placed at Merrill to monitor Merrill's financial condition.  According to Thain's January 26, 2009 memo, Merrill's senior executives tracked Merrill's losses and reported such information to BAC executives daily.  Specifically, BAC's senior executives had "daily access to our [profit & loss statements], our positions and our marks."

197.   Also, during Thain's *PBS Frontline* interview, he explained in greater detail that he and Merrill senior executives, as well as BAC senior executives, received daily updates regarding Merrill's financial condition.  Further, a BAC spokesperson told *The New York Times* that "we have not disputed that we were kept informed about the financial condition of the company."

198.   Knowledge of Merrill's losses was well-known among BAC's senior executives – as newspapers and the NY AG's investigation have established.  BAC's senior executives repeatedly discussed terminating the Merger pursuant to the MAC clause and informing shareholders of Merrill's growing losses, as more fully described above.

199.   **Second**, by November 2008, BAC's and Merrill's senior executives knew of the billions of dollars of goodwill impairments, but represented to regulators that such impairments

arose after the shareholder vote.  As the NY AG stated in his September 8, 2009 letter (and civil complaint), "[e]ven though it was known by November, this write-down became part of the purportedly 'surprising' losses that were included in Merrill's financials more than a month after the December 5 shareholder vote."  Defendants' actual knowledge of this write-down coupled with their false claims of "surprise" as to its existence further supports an inference of scienter.

200.    **Third**, Defendants knew or were reckless in not knowing that BAC did not perform adequate due diligence.  Therefore Defendants had no reasonable basis to represent that Merrill's risk profile had improved without also disclosing that it remained high, or to make representations about the expected benefits of the Merger.  After reviewing internal documents that Merrill made available to BAC during the due diligence procedure, Federal Reserve officials concluded that BAC's due diligence was grossly inadequate, and not performed as extensively as Lewis and Price represented to investors.

201.    **Fourth**, in contradiction to BAC's statement that it had a "strong capital position funding capabilities and liquidity" Defendants knew that BAC's capital position was weak.  In a December 19, 2008 e-mail, Tim Clark, a Senior Advisor at the Federal Reserve, highlighted BAC's financial deterioration, writing that the financial conditions at BAC "have also deteriorated recently," and noted that "the firm is very thinly capitalized."

202.    **Fifth**, as set forth above, without informing the investing public, Defendants were aware of the bonus agreement to accelerate the payment of Merrill's bonuses because: (i) it was the focus of discussions during the negotiations of the Merger and was included in the Merger Agreement; (ii) Lewis and Thain negotiated the bonus agreement; (iii) BAC and Merrill executives determined and/or approved the ultimate bonus amounts and specific payment dates throughout the fourth quarter of 2008.  Additionally, Defendants were aware that the bonus

agreement had not been disclosed to the investing public because the bonus agreement was set forth in a separate document that was meant to be, and was in fact, withheld from the investing public.

203.    Additional facts summarized below further establish the individual scienter of Defendants Lewis, Thain, Price and Cotty.

**A.    Additional Allegations of Lewis' Scienter**

204.    Lewis admitted in sworn testimony before Congress and the NY AG that he received regular updates regarding the financial condition of BAC and Merrill throughout the Class Period and knew of the companies' escalating losses before the shareholder vote on the Merger.  As described above, Lewis admitted that BAC in general, and he in particular, received "detailed financial reports every week from Merrill and that he received profit and loss statements for BAC and regular projections of Merrill's losses."  During Lewis' testimony before the House Subcommittee, when asked whether any member of the transition team reported Merrill's losses to Lewis before the shareholder vote, Lewis responded: "we did have people there and we did know that there were losses. And that was clear both at our company and theirs."   Thus, Lewis knew of the $4.5 billion net loss through October and mounting losses through November and December.

205.    As CEO and Chairman of the BAC board, Lewis led the board meetings on December 9, December 22, and December 30.  During these meetings, the BAC Board discussed Merrill's losses and decided, that although they had grounds to invoke the MAC clause, to complete the Merger and accept a $138 billion taxpayer bailout to prevent the threatened insolvency of the combined company – all without disclosing these facts to the investing public.

206.    Lewis personally discussed BAC's intention to invoke the MAC clause with

Paulson, Bernanke and other federal regulators, also without informing the investing public.

207.    Lewis was motivated to conceal material facts regarding BAC's intention to invoke the MAC clause because he knew that if these facts were disclosed prior to the close of the Merger, he would be terminated.  Lewis admitted this in sworn testimony before the NY AG.  As contained in the NY AG's April 23, 2009 letter to congress, "Secretary Paulson's threat swayed Lewis.  According to Secretary Paulson, after he stated that the management and the Board could be removed Lewis replied, 'that makes it simple.  Let's deescalate.'  Lewis admits that Secretary Paulson's threat changed his mind about asserting the MAC clause and terminating the deal."

208.    Lewis was also motivated to conceal material facts from investors, and thus ensure that the Merger was completed, because Lewis knew that if investors learned the truth about Merrill's financial condition, it would show that the statements he had made over the prior two months regarding the purported benefits of the Merger and BAC's due diligence were false, and call into question his judgment and competence in agreeing to pay a premium for Merrill.

209.    Bernanke expressly told Lewis that if Lewis invoked the MAC clause after Lewis had praised the Merger and extolled BAC's due diligence for months, it would cast doubt on the truthfulness of Lewis' statements and his judgment.  In addition to those admonitions, a set of "[t]alking points for [BAC] Discussion," prepared by the Federal Reserve official in advance of their conversation with Lewis on December 21, 2008, provided that regulators also foresaw "significant reputational consequences" for BAC if it abandoned the deal, warning that investors would conclude BAC was "too weak" to complete the acquisition.

210.    Consistent with these motivations, Lewis made the conscious decision to conceal numerous highly material facts from BAC's investors.  Within weeks of the announcement of the

Merger, Lewis realized that Merrill was suffering, in his own words, a "staggering amount of deterioration." Nevertheless, Lewis knowingly withheld this highly material information from investors, testifying before Congress that "I was instructed that 'we do not want a public disclosure.'"

211.   Lewis was so conscious of his liability to investors for proceeding with the Merger without disclosing Merrill's losses, the violation of the MAC clause, or the taxpayer bailout, that, in an attempt to immunize himself from lawsuits, he sought, but was refused, a letter from Bernanke affirming that he was forced to close the Merger, despite the existence of a material adverse change.

212.   Moreover, Lewis's repeated inconsistencies in his statements to regulators and sworn testimony to Congress and the NY AG, and in his public statements to BAC shareholders, are strong circumstantial evidence of Lewis's scienter. For example, on December 17, 2008, Lewis told federal regulators that he only became aware of Merrill's losses in mid-December, after the shareholder vote. Likewise, during the January 16, 2009 conference call to discuss Merrill's losses, Lewis told investors that the "loss materialized late in the quarter in December." However, numerous facts establish that these statements were false, and amounted to nothing more than an attempt to cover up the fact that Lewis and his senior officers had personal knowledge of, or recklessly disregarded, Merrill's severe and accelerating losses throughout the entire fourth quarter.

213.   Thain – who, as Merrill's CEO, had personal knowledge of the pace and timing of Merrill's losses – confirms that Lewis' version of the facts not "what actually happened":

> Question:   Ken Lewis tells us that in the time between the Dec. 5 stockholders' meeting and his going to Washington and asking for the get-out-of-jail clause, something substantial changed. What would it have been, do you think?

Thain:    I don't know what he's referring to. If you look at what actually happened in the fourth quarter, October was the worst month, which is not surprising, because it comes right after the Lehman bankruptcy. We lost about $7 billion in the month of October. . . . October was by far the worst.

214.    Corroborating Thain's first-hand account, during Lewis' hearing before Congress, one of the representatives cited a December 23 e-mail to Bernanke from Alvarez, that stated: "Lewis should have been aware of the problems at Merrill Lynch [before the December 5, shareholder vote], perhaps as early as mid-November, and not caught by surprise." Additionally, at the request of Congress, an impartial expert conducted a statistical analysis of Merrill's losses and concluded that "the evidence for a constantly deteriorating [] trend [in Merrill's losses] is much stronger on November 14 than it is on December 12." Moreover, as set forth above, even without the benefit of this evidence, the country's most senior banking regulators, after reviewing Merrill's loss data, concluded that Lewis's claim of mid-December "surprise" was "not credible."

215.    Further corroborating the conclusion that Lewis' claim of surprise was false, the NY AG's investigation has revealed that BAC's senior executives knew of at least $14 billion in Merrill losses before the shareholder vote (with the potential for billions of dollars more), plus another $2 billion in Merrill goodwill impairments. As early as November 20, 2008, senior BAC executives debated whether to disclose these losses, and on December 1 and 3, 2008, senior BAC executives debated "whether Bank of America had a MAC in light of Merrill's deteriorating financial condition" – facts that the NY AG wrote were "of tremendous significance because [they are] at odds with Bank of America's position that it only became concerned with mounting losses after the shareholder vote."

216.    As another example of Lewis' knowing and/or recklessly disregarding false and

inconsistent statements, during Lewis's June 11, 2009 Congressional testimony, he initially stated that he "did not recall" asking Bernanke for a letter immunizing Lewis from shareholder suits:

| Question: | You requested a letter from the government saying that the government ordered you to close the deal to acquire Merrill. Wasn't there such a letter? |
|---|---|
| Lewis: | I don't recall such a letter. |
| Question: | You're under oath. But your answer is you do not recall? |
| Lewis: | I do not recall a letter. |
| Question: | Isn't it true that your request of that letter was motivated by your desire to protect yourself from your shareholders? |
| Lewis: | Well, sir, if I can't recall it, I can't answer the second question. |

Lewis only acknowledged his request after Congress confronted him with the e-mail from Bernanke documenting this exact request.

217.    Likewise, during Lewis' sworn deposition taken by the NY AG in February 2009, he specifically testified that after he approached the U.S Government for a bailout in mid-December Paulson "instructed" him not to disclose: (i) Merrill's losses, (ii) BAC's resulting need for taxpayer assistance, or (iii) the Government bailout. When Lewis testified before Congress in June 2009, however, he changed his story, stating that there was never a time when he was told to hold back on disclosing this information.   Noting this reversal, Representative Watson cautioned Lewis, "Okay. Remember you're under oath."

218.    Lewis also made false statements to Congress regarding his involvement in approving Merrill's bonuses.  Lewis portrayed his involvement in approving the bonuses as "very limited," stating that Merrill was "a public company until the first of the year. They had a separate board, separate compensation committee and we had no authority to tell them what to

do, just urged them what to do." In reality, as set forth above, Lewis was directly involved in Merrill's bonus payments because he specifically authorized Merrill to accelerate bonus payments at the time he negotiated the Merger Agreement.

219.    In addition – as federal regulators have independently confirmed after reviewing BAC's due diligence and speaking directly with Lewis – Lewis knew that BAC's due diligence of Merrill was inadequate. As set forth above, after reviewing BAC's due diligence and discussing it with Lewis, senior Federal Reserve officials concluded that Lewis "is worried about stockholder lawsuits; knows they did not do a good job of due diligence and the issues facing the company are finally hitting home and [Lewis] is worried about his own job after cutting loose lots of very good people."

### B.    Additional Allegations of Thain's Scienter

220.    Thain has admitted that he knew of Merrill's growing daily losses. As described above, Thain affirmed that Merrill generated daily profit and loss statements; that Merrill's and BAC's senior executives, including himself received this information as it was generated; and that October 2008 was the worst month of the fourth quarter.

221.    Additionally, Thain has admitted that he had personal knowledge of the bonus agreement at the time it was negotiated over September 13 and 14, 2008. Specifically, Thain testified that "I was aware that the bonus agreement was being negotiated" and that he was kept apprised of its salient terms, including the terms allowing "us, Merrill Lynch, to be able to pay bonuses to our employees prior to the deal closing," and that there was a provision that "set up a cap on the amount that we could pay out."

222.    Not only was Thain aware of the bonus agreement, but he was involved in finalizing the accelerated bonuses throughout the fourth quarter of 2008. In early November he

and Alphin, determined the final size of the bonus pool.  On November 11, 2008, Thain presented the bonus amounts and the accelerated schedule of payments to Merrill's compensation committee, which approved the schedule.

223.   Thain also admitted that (i) he knew without the Merger, Merrill would become effectively insolvent; and (ii) Paulson pressured BAC and Merrill to finalize the Merger by "very strongly encouraging [Thain] to make sure that [he] got a transaction done prior to the opening on Monday," which were contradictory to statements he made to the investing public.

### C.    Additional Allegations of Price's Scienter

224.   As alleged herein, Price – as Merrill's acting CFO – received daily updates on Merrill's financial condition.  According to the NY AG's letter dated September 8, 2009, Price closely monitored Merrill's losses and impairments throughout the fourth quarter of 2008, repeatedly discussed with other BAC executives whether to invoke the MAC clause or otherwise disclose Merrill's financial condition, and made the decision to not disclose these facts.

225.   Prior to the shareholder vote, Price discussed Merrill's growing losses with BAC directors during conference calls led by Lewis.  Based on personal knowledge of Merrill's increasing losses, Price (and Lewis) reported Merrill's mounting losses to the BAC Board on December 9, 22, and 30, 2008.

226.   Additionally, Price participated in meetings on December 17, 19 and 21, 2008 with Lewis, Paulson, Bernanke and other regulators regarding the existence of a material adverse change in Merrill's financial condition and BAC's resulting need for a taxpayer bailout.  During those meetings, it is believed that Price took handwritten notes memorializing the discussions. Lewis also reported to the board on December 30, 2008 that Price had been intimately involved in negotiations with the federal government for additional TARP funding.

### D.    Additional Allegations of Cotty's Scienter

227.    Numerous facts establish that Cotty had personal knowledge of Merrill's undisclosed losses throughout the fourth quarter of 2008.  Before and after the Merger was announced, Cotty served as BAC's Chief Accounting Officer.  Immediately following the September 15, 2008 announcement of the Merger, Cotty was appointed Merrill's interim CFO, and acted as a direct liaison for relaying financial information between Merrill and BAC, including to Lewis and Price.  Thus, as Thain specifically stated, Cotty was provided with Merrill's daily profit and loss statements and received access to Merrill's positions and accounting marks.

228.    Moreover, Thain testified under oath that Cotty was not merely provided with this information, but that he actively discussed it during Merrill's weekly meetings.  Specifically, Thain was asked what was "happening in terms of you updating them [*i.e.*, BAC senior officers] on how things were going," and Thain testified that, "[t]he acting chief financial officer, Neil Cotty, sat in meetings and discussions and was totally up-to-speed as to what was happening" throughout the fourth quarter.

229.    Despite Cotty's actual knowledge as to Merrill's escalating losses in October and November 2008, he signed the false and misleading Joint Proxy Statement and otherwise failed to disclose any of this highly material information to BAC shareholders.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

230.    Defendants' unlawful conduct alleged herein directly caused the losses incurred by Plaintiffs and the Class.  Throughout the Class Period, the prices of BAC options were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  The false and misleading statements and omissions set forth above were widely

disseminated to the securities markets, investment analysts, and the investing public.  The true facts became known by investors and the market through a series of partial corrective disclosures.  By making contemporaneous additional misstatements in connection with these partial disclosures or by failing to disclose all material facts at one time, artificial inflation remained in BAC options throughout the Class period.

231.   As the true facts became known and/or materialization of the risks that had been fraudulently concealed by Defendants occurred, the price of BAC options was adversely affected as the artificial inflation was removed from the market price of the securities, causing substantial damage to Plaintiffs and the members of the class.

232.   During the Class Period, Defendants engaged in a course of conduct that artificially inflated the price of BAC common stock, and consequently BAC options, and operated as a fraud or deceit on purchasers of the securities.  The price decline of the securities occurred immediately after the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed beginning on October 6, 2009 in BAC's partial disclosure of its deteriorating financial condition with respect to both the adequacy of its capital and declining earnings.  As a result, Plaintiffs and other Class members suffered damages.

233.   On October 6, 2008, BAC issued a Press Release and the Prospectus Supplement that omitted information regarding BAC's exposure to credit markets and how changes in the market were affecting BAC.  After BAC issued the October 6th Press Release, the price of shares of BAC stock (the price of which the options are based on, among other things) fell over 26 percent, dropping from a close of $32.22 on October 6, 2008 to close at $22.77 on October 7, 2008.

234. On January 12, 2009, a Citigroup analyst wrote that BAC might post a multibillion fourth quarter loss and cut its quarterly dividend from $0.32 to $0.05 per share. After this report, the price of BAC shares fell by 12 percent falling from $12.99 at the close of the market on the prior day to $11.43.

235. On January 14, 2009 in Australia, which was January 13 in New York, Merrill executives in Australia warned a bond trader of imminent "awful" news, and admitted that "[t]he market is expecting Merrill Lynch in New York to come out with a bad result on Thursday night." Following this news, the price of BAC shares fell 11 percent from a close at $11.43 on January 12, 2009 lose of $10.20 on January 14, 2009.

236. Another partial disclosure occurred on January 15, 2009, when *The Wall Street Journal* reported on BAC's imminent TARP injection. On this news, BAC shares dropped 18 percent, leaving BAC shares to close at $8.32, an 18-year low.

237. On January 16, 2009, BAC announced its fourth quarter results, revealing, among other things, the $15.5 billion losses at Merrill and that TARP funds were necessary to complete the Merger. These disclosures caused BAC stock to drop another 14 percent on January 16 to close $7.18.

238. After the close of the markets on January 16, 2009, it was reported that Moody's had downgraded BAC's credit rating due to "the disclosure of substantial losses of Merrill Lynch" and Fitch had downgraded Merrill's individual rating to "F" due to its "massive losses" and its inability to "survive absent assistance provided by the U.S, Treasury."

239. On Saturday, January 17, 2009, *The New York Times* reported that, given Merrill's staggering losses, BAC's management had sought to exercise the MAC clause after the vote but before the closing of the Merger, and was dissuaded from doing so by the Government.

*The Wall Street Journal* reported on January 17 that BAC's own precarious financial condition. According to an analyst quoted in *The Wall Street Journal* article, Lewis "has very little credibility with the investor public right now." On Tuesday, January 20, the next trading day, BAC's stock fell an additional 29% to close at $5.10, also on extremely heavy volume, as a result of these disclosures.

240.   Following the *Financial Times* article revealing the accelerated bonus payments to Merrill executives and employees, BAC stock dropped another 15% on January 22, 2009, the trading day immediately following the publication of the article.

241.   Each of the above referenced disclosures only partially corrected the false and misleading information previously made available to the market by Defendants' wrongful course of conduct.

242.   It was foreseeable to BAC, Lewis, Thain, Price, and Cotty, that concealing the following from investors would affect the price of BAC options:   (i) the circumstances surrounding the negotiations of the Merger (including the lack of due diligence and the pressure from federal regulators); (ii) Merrill's losses; (iii) BAC's decision to invoke the MAC clause after learning of Merrill's staggering losses; (iv) BAC's own deteriorating financial condition, (v) the taxpayer bailout, and (vi) the secret agreement allowing Merrill to accelerate payment of bonuses to executives and employees before the Merger closed.

243.   It was similarly foreseeable that the ultimate disclosure of this information and, in particular, the truth about Merrill's financial condition, BAC's financial condition, the accelerated bonus payments, and circumstances surrounding the negotiations of the Merger, would cause the price of BAC's options to drop precipitously as the inflation caused by Defendants' earlier statements was removed from the stock by the corrective disclosures set forth

herein.

244.    Defendants' conduct as alleged herein proximately caused foreseeable losses to Plaintiffs and members of the Class.

## VIII.    FRAUD ON THE MARKET

245.    The market for BAC options was open, well-developed and efficient at all relevant times.  As a result of the materially false and misleading statements and failures to disclose set forth above, BAC options, traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired BAC call options or sold BAC put options relying upon the integrity of the market price of BAC options and market information relating to BAC, and have been damaged thereby.

246.    BAC options met the requirements for listing and were actively traded on the following exchanges: (i) the American Stock Exchange (now known as NYSE Amex Equities); (ii) the Boston Stock Exchange; (iii) the Chicago Board Options Exchange; (iv) International Securities Exchange; (v) New York Stock Exchange Arca; (vi) Philadelphia Stock Exchange; and (vii) the Nasdaq Options Market.

247.    During the Class Period, the prices of BAC options were published daily and were readily available.

248.    During the Class period, more than 18 million BAC options contracts were traded.

249.    BAC was extensively followed by securities analysts from firms including, JPMorgan Chase &Co., Citigroup Inc., and Deutsche Bank AG, among others, who wrote reports about BAC and the value of its securities in the public market.

250.    According to registration requirements, BAC filed periodic public reports with the SEC.

251.   BAC communicated with public investors via established market communications, including the regular issuance of press releases and conference calls with analysts and investors.

252.   As a result of the materially false and misleading statements and omissions set forth above, BAC's common stock, and accordingly options, traded at artificially inflated prices during the Class Period.   Plaintiffs and other members of the Class purchased or otherwise acquired BAC call options and/or sold BAC put options relying upon the integrity of the market price of BAC options and market information relating to BAC, and have been damaged thereby.

253.   During the Class Period, Defendants misled the investing public, thereby inflating the price of BAC options, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.   These statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about BAC, its business and operations.

254.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.

## IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

255.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded herein.

256.   None of the statements complained of herein were forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions

at the time the statements were made, including statements about the due diligence performed in connection with the Merger, the pressure exerted by federal regulators, Merrill's and BAC's then-existing financial condition, and the payment of accelerated, discretionary bonuses to Merrill's executives and employees.

257.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.   As set forth above, then-existing facts contradicted Defendants' statements regarding the due diligence performed in connection with the Merger, the pressure exerted by federal regulators, Merrill's and BAC's financial condition, and the payments of accelerated, discretionary bonuses to Merrill's executives and employees. Given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by BAC or Merrill were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

258.    To the extent that the statutory safe harbor may apply to any of false statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew the statement was false, or the statement was authorized and/or approved by an executive officer of BAC who actually knew that the statement was false.

## X.    CLASS ACTION ALLEGATIONS

259.    This is a securities class action filed on behalf of all persons and entities that purchased or otherwise acquired BAC call options and/or sold BAC put options between September 15, 2008 and January 22, 2009 and who were damaged thereby.

260.    Excluded from the Class are Defendants, present or former executive officers and directors of BAC or Merrill, members of the immediate families of each of the Individual Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in interest or assigns of any such excluded.

261.    The members of the Class are so numerous that joinder of all members impracticable.

262.    The precise number of members of the Class is unknown to Plaintiffs at this time, but it is believed that there are hundreds, if not thousands, of BAC options traders.  Notice can be provided to class members by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions.

263.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation to further ensure such protection and to prosecute this action vigorously.

264.    Plaintiffs' claims are typical of the claims of the other members of the Class, because Plaintiffs and all of the Class members' damages arise from and were caused by the same materially inaccurate representations and omissions made by or chargeable to Defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with any member of either of the Class.

265.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible

for the them to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

266.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants' conduct violated the federal securities laws as alleged herein;

(b)    whether the SEC filings, including the Joint Proxy Statement and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

(c)    whether and to what extent the market prices of BAC options were artificially inflated during the Class Period due to the misstatements and/or omissions alleged of herein;

(d)    whether the Defendants acted with scienter;

(e)    whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

(f)    whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

267.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

268.     During the Class Period, Defendants disseminated or approved the false statements and omissions set forth above which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

269.     These Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and members of the Class in connection with their purchase of BAC options during the Class Period.

270.     As set forth above, the misrepresentations contained in, or the material facts omitted from, Defendants' public statements included, false and misleading representations and omissions regarding: (a) the billions of dollars of losses suffered by Merrill and BAC; (b) that Merrill's assets were so complex and illiquid that it was difficult to value the company with any degree of specificity; (c) that the value of Merrill's assets were substantially less than stated; (d) that Merrill and BAC had agreed to pay $3.6 billion in Merrill bonus prior to the closing of the Merger, and made other false representations about bonus awards, including that they would be paid in January; (e) that BAC's due diligence in connection with the Merger was grossly deficient; (f) that federal regulators had exerted pressure on the companies to quickly negotiate a deal; (g) that contrary to the statements in the Joint Proxy Statement, Merrill and BAC had suffered material adverse changes to their financial conditions; (h) an additional $2.3 billion

goodwill charge that would have to be added to Merrill's losses; and (i) that despite the undisclosed mounting losses at BAC and Merrill, the Joint Proxy portrayed the financial condition of the combined company as strong.

271.    These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and members of the Class; made false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with knowledge or a reckless disregard for the truth; and employed devices, schemes and artifices to defraud in connection with the purchase or sale of securities, which were intended to, and did: (i) deceive the investing public, Plaintiffs and members of the Class, regarding, among other things, the events that had materially adverse effects on Merrill's and BAC's financial condition and the undisclosed agreement to allow Merrill to pay billions of dollars in bonus compensation prior to the merger; (ii) artificially inflate and maintain the market price of BAC common stock, and thereby the options prices; and (iii) cause Plaintiffs and members of the Class to purchase or sell BAC options at artificially inflated prices.

272.    As set forth above, Defendants had a duty to disclose Merrill's material losses, the deteriorating financial condition of the two companies, and the secret bonus agreement when the Proxy was filed, prior to the shareholder vote, and before the Merger closed. Defendants also had a duty to disclose the secret bonus agreement at the time they filed the Merger Agreement.

273.    Defendants had a duty to disclose this information because they were required to update and/or correct their prior misstatements and omissions. Defendants repeatedly

misrepresented that the merger would be beneficial to BAC shareholders, and misrepresented in the Joint Proxy Statement and the attached Merger Agreement that no material adverse events had occurred. Defendants had a duty to update and correct these and other misrepresentations. By continuing to discuss the merger in supplements to the Proxy, Defendants had a duty to correct and update prior misstatements and statements that had become misleading, and to speak completely and truthfully about the merger. Defendants also had a duty to disclose known trends affecting liquidity, income, and revenues in the Joint Proxy Statement, and in supplements thereto, including the losses at both BAC and Merrill.

274.    Defendants were required to disclose, before the Merger closed, the events which occurred during the fourth quarter of 2008, including events that occurred through December 2008. This is because such facts were material and because Defendants were under a continuing obligation and duty to correct and/or update their prior statements concerning the Merger, including the statements made on September 15, 2008 and in the Joint Proxy Statement, each of which had clearly been rendered materially misleading by the events that occurred in December 2008.

275.    Defendants are liable for all materially false and misleading statements made during the Class Period, including, without limitation, the false and misleading statements and omissions set forth above which appeared in: (i) the September 15, 2008 Press Release, Conference Call, and Press Conference; (ii) BAC's September 18, 2008 Form 8-K; (iii) the October 6th Press Release; (iv) the October 9th Offering Documents; (v) the October 16th Press Release; (vi) the Merger Registration Statement; (vii) Merrill's November 21, 2008 Form 8-K; (viii) BAC's November 26, 2008 Proxy Supplement; (ix) the December 5th Press Release; and (x) the January 1st 2009 Press Release.

276.     These statements were materially false and misleading because, among other things, they misrepresented the financial conditions of Merrill and BAC, the conditions under which the Merger Agreement was reached, the terms of the Merger Agreement.  They failed to disclose Merrill's losses and the secret bonus agreement.  They also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.

277.     As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them. Specifically, these Defendants knew or should have known, *inter alia*, that Government officials had pressured the parties into announcing a Merger Agreement on September 15, 2008; that the financial conditions of BAC and Merrill were severely deteriorating throughout the fourth quarter of 2008; that the Merger Agreement had been reached with grossly deficient due diligence; and that the Merger Agreement included an undisclosed side agreement to allow Merrill to pay up to $5.8 billion in bonuses before the merger occurred.

278.     These Defendants engaged in this scheme in order to maintain and/or inflate the prices of BAC common stock, and accordingly BAC options.

279.     As a result, Plaintiffs and members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they traded BAC options at artificially inflated prices..  Plaintiffs and members of the Class would not have purchased BAC call options or sold BAC put options at the prices they did, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements and/or omissions of material facts.

280.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of BAC options during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### (Against Defendants Lewis, Price and Cotty)

281.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

282.     This Count is asserted against Defendants Lewis, Price and Cotty for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

283.     During their tenures as officers of BAC, each of these Defendants was a controlling person of BAC within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers of BAC, these Defendants had the power and authority to cause BAC to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by BAC during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

284.     In their capacities as senior corporate officers and/or directors of BAC, and as set forth above, these Defendants were made aware of the circumstances surrounding the Merger, including the terms of the Merger, the bonus agreement, the due diligence was grossly deficient, and the financial conditions of both Merrill and BAC.

285.     As a result of the foregoing, Lewis, Price and Cotty were control persons of BAC within the meaning of Section 20(a) of the Exchange Act.

286.     As set forth above, BAC violated Section 10(b) of the Exchange Act by its acts

and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of BAC and, as a result of their own aforementioned conduct, Lewis, Price and Cotty are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as BAC is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and other members of the Class who purchased or otherwise acquired BAC call options or sold BAC put options.

287.    Moreover, as detailed above, during the respective times these Defendants served as officers of BAC, each of these Defendants is responsible for the material misstatements and omissions made by BAC.

288.    As a direct and proximate result of these Defendants' conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchase of BAC call options or sale of BAC put options.

## COUNT III

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendant Thain)

289.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

290.    This Count is asserted against Defendant Thain for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

291.    During his tenure as Merrill's CEO and Chairman and BAC's President of Global Banking, Securities and Wealth Management, Thain was a controlling person of Merrill within the meaning of Section 20(a) of the Exchange Act. By reason of his positions of control and authority as Merrill's CEO and Chairman, Thain had the power and authority to cause Merrill to engage in the wrongful conduct complained of herein. Thain was able to and did control,

directly and indirectly, the content of the public statements made by Merrill during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

292.    In his capacity as Merrill's CEO and Chairman, and as more fully described above, Defendant Thain was made aware of the circumstances surrounding the merger, including the terms of the merger, the due diligence that had and had not been performed, and analyses of the financial conditions of Merrill and the bonus agreement. As a result of the foregoing, Thain was a controlling person of Merrill within the meaning of Section 20(a) of the Exchange Act.

293.    As set forth above, Merrill violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of his position as a controlling person of Merrill and, as a result of his own aforementioned conduct, Thain is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Merrill is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and other members of the Class who purchased or otherwise acquired BAC call options and/or sold BAC put options.

294.    As described above, during the time that Thain served as Merrill's CEO and Chairman, he was responsible for the material misstatements and omissions made by Merrill.

295.    As a direct and proximate result of Thain's conduct, Plaintiffs and other members of the Class suffered damages in connection with their trading of BAC options.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs'

counsel as counsel for the Class;

      B.     Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct in an amount to be proven at trial;

      C.     Awarding Plaintiffs and the Class pre-judgment interest;

      D.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      E.     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: March 2, 2010

Respectfully submitted,

**ZWERLING, SCHACHTER &**
**ZWERLING, LLP**

By:      s/Richard A. Speirs
Richard A. Speirs
Robin F. Zwerling
Justin M. Tarshis
41 Madison Avenue
32nd Floor
New York, New York 10010
Tel: (212) 223-3900
Fax: (212) 371-5969
rspeirs@zsz.com
jtarshis@zsz.com

80

## <u>CERTIFICATION OF KENNETH A. CIULLO AND JOANNA CIULLO</u>

We, Kenneth A. Ciullo and Joanna Ciullo, declare that:

1.      We have reviewed the complaint in *Ciullo v. Bank of America* and authorize the filing of the Complaint motion on our behalf.

2.      We did not purchase or acquire any security that is the subject of this action at the direction of plaintiffs' counsel or in order to participate in this private action under the federal securities laws.

3.      We are willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Our transactions in Bank of America common stock options that are the subject of this action during the class period are as follows:

| <u>Date</u> | <u>Security</u> | <u>Transaction</u> | <u># Units</u> | <u>Price</u> | <u>Total</u> |
|---|---|---|---|---|---|
| | | SEE ATTACHMENT A | | | |

5.      During the three years prior to the date of this Certification, we has not served, or sought to serve, as a representative party for a class in any actions filed under the federal securities laws.

6.      We will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except for an award, as ordered or approved by the court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the class.

We, Kenneth A. Ciullo and Joanna Ciullo, declare under penalty of perjury that the foregoing is true and correct.

Dated: ~~January __, 2009~~ February 26, 2010

_____
Kenneth A. Ciullo

_____
Joanna Ciullo

2

**ATTACHMENT A**

**KENNETH A. CIULLO AND JOANNA CIULLO**

| Date | Purchased/Sold | Quantity | Put/Call | Price | Total | Strike Date | Strike Price |
|------|----------------|----------|----------|-------|-------|-------------|--------------|
| 09/15/08 | Purchased | 50.00 | Put | 1.3200 | ($6,675.00) | September | $30.00 |
| 09/15/08 | Purchased | 75.00 | Put | 1.0600 | ($8,062.50) | September | $27.50 |
| 09/15/08 | Purchased | 75.00 | Put | 1.1600 | ($8,812.50) | September | $27.50 |
| 09/15/08 | Purchased | 50.00 | Call | 2.0200 | ($10,175.00) | September | $27.50 |
| 09/15/08 | Purchased | 25.00 | Call | 1.7500 | ($4,412.50) | September | $27.50 |
| 09/15/08 | Purchased | 75.00 | Put | 1.5700 | ($11,887.50) | September | $27.50 |
| 09/16/08 | Purchased | 2.00 | Call | 1.9200 | ($398.95) | September | $25.00 |
| 09/16/08 | Purchased | 75.00 | Call | 1.8000 | ($13,612.50) | September | $27.50 |
| 09/16/08 | Purchased | 50.00 | Put | 2.1000 | ($10,575.00) | September | $27.50 |
| 09/16/08 | Purchased | 50.00 | Put | 1.5500 | ($7,825.00) | September | $27.50 |
| 09/16/08 | Purchased | 25.00 | Call | 3.4500 | ($8,662.50) | October | $27.50 |
| 09/16/08 | Purchased | 50.00 | Put | 0.9800 | ($4,975.00) | September | $27.50 |
| 09/17/08 | Purchased | 25.00 | Call | 1.2500 | ($3,162.50) | September | $27.50 |
| 09/17/08 | Purchased | 10.00 | Call | 1.3900 | ($1,405.00) | September | $27.50 |
| 09/17/08 | Purchased | 15.00 | Call | 1.4300 | ($2,167.50) | September | $27.50 |
| 09/17/08 | Purchased | 10.00 | Put | 3.2000 | ($3,215.00) | October | $27.50 |
| 09/17/08 | Purchased | 10.00 | Put | 3.1500 | ($3,165.00) | October | $27.50 |
| 09/17/08 | Purchased | 20.00 | Put | 3.1800 | ($6,390.00) | October | $27.50 |
| 09/17/08 | Purchased | 20.00 | Put | 2.8000 | ($5,630.00) | October | $27.50 |
| 09/17/08 | Purchased | 20.00 | Put | 2.9700 | ($5,970.00) | October | $27.50 |
| 09/17/08 | Purchased | 20.00 | Put | 2.8500 | ($5,730.00) | October | $27.50 |
| 09/17/08 | Purchased | 30.00 | Call | 1.7500 | (5,295.00) | September | $27.50 |
| 09/17/08 | Purchased | 30.00 | Call | 1.5300 | ($4,635.00) | September | $27.50 |
| 09/18/08 | Purchased | 20.00 | Call | 3.3500 | ($6,730.00) | October | $27.50 |
| 09/18/08 | Purchased | 20.00 | Call | 4.0000 | ($8,030.00) | October | $27.50 |
| 09/18/08 | Purchased | 20.00 | Put | 3.1000 | ($6,230.00) | October | $30.00 |

| Date | Purchased/Sold | Quantity | Put/Call | Price | Total | Strike Date | Strike Price |
|------|----------------|----------|----------|-------|-------|-------------|--------------|
| 09/19/08 | Purchased | 20.00 | Put | 1.3000 | ($2,630.00) | October | $30.00 |
| 09/19/08 | Purchased | 20.00 | Put | 1.1000 | ($2,230.00) | October | $30.00 |
| 09/19/08 | Purchased | 20.00 | Put | 1.6000 | ($3,230.00) | October | $32.50 |
| 09/19/08 | Purchased | 20.00 | Put | 2.4000 | ($4,830.00) | October | $35.00 |
| 09/19/08 | Purchased | 36.00 | Call | 3.5300 | ($12,762.00) | September | $32.50 |
| 09/19/08 | Purchased | 19.00 | Call | 3.6100 | ($6,887.50) | September | $32.50 |
| 09/19/08 | Purchased | 13.00 | Call | 3.5700 | ($4,660.50) | September | $32.50 |
| 09/22/08 | Purchased | 25.00 | Call | 2.4000 | ($6,037.50) | October | $35.00 |
| 09/22/08 | Purchased | 25.00 | Call | 2.2000 | ($5,697.50) | October | $35.00 |
| 09/23/08 | Purchased | 25.00 | Call | 2.9500 | ($7,412.50) | October | $32.50 |
| 09/23/08 | Purchased | 25.00 | Call | 1.7000 | ($4,267.50) | October | $35.00 |
| 09/24/08 | Purchased | 20.00 | Call | 3.2500 | ($6,530.00) | October | $32.50 |
| 09/24/08 | Purchased | 15.00 | Call | 2.9700 | ($4,477.50) | October | $32.50 |
| 09/25/08 | Purchased | 30.00 | Put | 2.3000 | ($6,945.00) | October | $35.00 |
| 09/25/08 | Purchased | 15.00 | Put | 1.4500 | ($2,197.50) | October | $32.50 |
| 09/25/08 | Purchased | 15.00 | Call | 2.1300 | ($3,217.50) | October | $35.00 |
| 09/25/08 | Purchased | 10.00 | Call | 2.1400 | ($2,155.00) | October | $35.00 |
| 09/25/08 | Purchased | 25.00 | Put | 2.6900 | ($6,762.50) | October | $35.00 |
| 09/26/08 | Purchased | 50.00 | Put | 2.4000 | ($12,075.00) | October | $35.00 |
| 09/26/08 | Purchased | 25.00 | Put | 2.1000 | ($5,287.50) | October | $35.00 |
| 09/26/08 | Purchased | 25.00 | Put | 2.4000 | ($6,037.50) | October | $35.00 |
| 09/29/08 | Purchased | 30.00 | Call | 2.7500 | ($8,295.00) | October | $35.00 |
| 09/29/08 | Purchased | 30.00 | Put | 2.8000 | ($8,445.00) | October | $35.00 |
| 09/29/08 | Purchased | 30.00 | Put | 2.3000 | ($6,945.00) | October | $35.00 |
| 09/29/08 | Purchased | 30.00 | Call | 1.7500 | ($5,295.00) | October | $35.00 |
| 09/29/08 | Purchased | 30.00 | Call | 1.6500 | ($4,995.00) | October | $35.00 |
| 10/3/08 | Purchased | 75.00 | Call | 2.5500 | ($19,194.24) | October | $35.00 |
| 10/3/08 | Purchased | 75.00 | Call | 2.0000 | ($15,069.24) | October | $35.00 |
| 10/6/08 | Purchased | 100.00 | Call | 1.5000 | ($15,084.99) | October | $35.00 |
| 10/6/08 | Purchased | 30.00 | Call | 2.4700 | ($7,442.49) | October | $32.50 |

| Date | Purchased/Sold | Quantity | Put/Call | Price | Total | Strike Date | Strike Price |
|------|----------------|----------|----------|-------|-------|-------------|--------------|
| 10/6/08 | Purchased | 50.00 | Call | 2.5000 | ($12,547.49) | October | $32.50 |
| 10/6/08 | Purchased | 50.00 | Call | 2.6500 | ($13,297.49) | October | $32.50 |
| 09/15/08 | Sold | -60.00 | Put | 4.1000 | $24,509.86 | September | $32.50 |
| 09/15/08 | Sold | -50.00 | Put | 1.7500 | $8,674.95 | September | $30.00 |
| 09/15/08 | Sold | -75.00 | Put | 1.2000 | $8,887.44 | September | $27.50 |
| 09/15/08 | Sold | -75.00 | Put | 1.3000 | $9,637.44 | September | $27.50 |
| 09/15/08 | Sold | -75.00 | Call | 1.9900 | $14,812.41 | September | $27.50 |
| 09/15/08 | Sold | -75.00 | Put | 1.8700 | $13,912.42 | September | $27.50 |
| 09/16/08 | Sold | -75.00 | Call | 2.2500 | $16,762.40 | September | $27.50 |
| 09/16/08 | Sold | -2.00 | Call | 3.1500 | $615.04 | September | $25.00 |
| 09/16/08 | Sold | -25.00 | Call | 3.8500 | $9,587.44 | October | $27.50 |
| 09/17/08 | Sold | -150.00 | Put | 1.2500 | $18,524.89 | September | $27.50 |
| 09/17/08 | Sold | -20.00 | Put | 3.5000 | ($6,969.96) | October | $27.50 |
| 09/17/08 | Sold | -50.00 | Call | 1.6500 | $8,174.95 | September | $27.50 |
| 09/17/08 | Sold | -80.00 | Put | 2.8000 | $22,279.87 | October | $27.50 |
| 09/18/08 | Sold | -60.00 | Call | 1.8100 | $10,789.93 | September | $27.50 |
| 09/18/08 | Sold | -20.00 | Call | 3.1500 | $6,269.96 | October | $27.50 |
| 09/18/08 | Sold | -20.00 | Call | 4.4500 | $8,869.95 | October | $27.50 |
| 09/19/08 | Sold | -36.00 | Call | 4.4300 | $15,893.91 | October | $32.50 |
| 09/19/08 | Sold | -19.00 | Call | 5.3100 | $10,060.44 | November | $32.50 |
| 09/19/08 | Sold | -13.00 | Call | 5.2700 | $6,831.46 | November | $32.50 |
| 09/22/08 | Sold | -20.00 | Put | 2.8500 | $5,869.96 | October | $35.00 |
| 09/22/08 | Sold | -20.00 | Put | 1.8600 | $3,689.97 | October | $32.50 |
| 09/23/08 | Sold | -25.00 | Call | 3.3000 | $8,212.45 | October | $32.50 |
| 09/24/08 | Sold | -60.00 | Put | 1.4800 | $8,789.95 | October | $30.00 |
| 09/25/08 | Sold | -35.00 | Call | 3.9500 | $13,772.42 | October | $32.50 |
| 09/25/08 | Sold | -75.00 | Call | 2.5000 | $18,637.39 | October | $35.00 |
| 09/25/08 | Sold | -30.00 | Put | 2.7500 | $8,204.95 | October | $35.00 |
| 09/25/08 | Sold | -15.00 | Put | 1.7500 | $2,602.48 | October | $32.50 |
| 09/26/08 | Sold | -25.00 | Call | 2.5800 | $6,412.46 | October | $35.00 |

| Date | Purchased/Sold | Quantity | Put/Call | Price | Total | Strike Date | Strike Price |
|---|---|---|---|---|---|---|---|
| 09/29/08 | Sold | -125.00 | Put | 2.6000 | $32,312.31 | October | $35.00 |
| 09/29/08 | Sold | -30.00 | Put | 4.0000 | $11,954.93 | October | $35.00 |
| 09/30/08 | Sold | -120.00 | Call | 2.5000 | $29,819.83 | October | $35.00 |
| 10/6/08 | Sold | 50.00 | Call | 2.8000 | $13,952.43 | October | $32.50 |
| 10/16/08 | Sold | 250 | Call | .0100 | $2.50 | October | $35.00 |
| 10/16/08 | Sold | 9 | Call | .0200 | $1.25 | October | $32.50 |
| 10/17/08 | Sold | 10 | Call | .0200 | $2.50 | October | $32.50 |

4